FILED
2023 Jun-15  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TOMEKA BARTLETT and** | ) | |
| **KAYLA CARREKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:18-cv-1096-CLS** |
| | ) | |
| **RANDY ALLAN HAMES,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Tomeka Bartlett and Kayla Carreker are former tenants of mobile homes owned and leased by Randy Allan Hames. They contend, among other things, that Hames violated Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.*, by soliciting sexual favors in exchange for rent. This opinion addresses: the motion for partial summary judgment filed by defendants Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C. (doc. no. 152); the motion by the same parties to strike a portion of the brief submitted by plaintiffs in response to the foregoing motion (doc. no. 196); the motion for partial summary judgment of defendants Christi Hames Dolbeer, Mary Catherine Hames, Jessica Hames Penner, Angela Hames Sahurie, and Miranda Hames Self — "the daughter defendants" (doc. no. 149); and, plaintiffs' motion for partial summary judgment (doc. no. 153).

# I.  MATERIAL FACTS

Randy Hames owned and operated Hames Marina, L.L.C., a mobile home park and marina in Cullman County, Alabama, from 1996 until March 9, 2018:  the date on which he conveyed title to his real property, including the land encompassing Hames Marina, to his five daughters.[1]  Those transactions occurred shortly after Hames was arrested for state criminal offenses that grew out of the manner in which he dealt with female tenants and former tenants of his mobile home park, two of whom are the plaintiffs in this action.[2]

## A.    Tomeka Bartlett

Tomeka Bartlett and her young daughter moved into a trailer in Hames Marina occupied by Bartlett's mother, sister, and infant niece in September 2017.[3]  Later that year, Hames asked Bartlett whether she wanted to lease one of his vacant trailers.[4]  Bartlett was interested, but could not afford the rent.[5]  Hames said he would "work with" her, and so she leased the trailer located on Lot 15 and moved in with her

---

[1] *See* doc. nos. 154-20 through 154-23 (Warranty Deeds conveying title from Randy Allan Hames to Jessica Hames Penner, Miranda Hames Self, Angela Hames Sahurie, Mary Catherine Hames, and Christi Hames Dolbeer).

[2] The arrests are discussed *infra*, in Part I.C.

[3] *See* doc. no. 152-2 (Bartlett dep.), at 90-92.

[4] *Id.* at 123.

[5] *Id.* at 123-24.

daughter on December 10, 2017.[6]

Bartlett and Hames agreed that rent would be $400 a month,[7] but Bartlett could pay only $300 on the date of occupancy.  She agreed to make up the balance in two installments during January and February of 2018.[8]

Bartlett testified that Hames twice entered her new trailer uninvited.  The first intrusion occurred on the day that Bartlett left work early as a result of illness.  Hames entered for the stated purpose of looking for a telephone that had been left by an electrician.  He was inside the trailer for only a short time, and he neither touched Bartlett nor said "anything sexual."[9]

The second intrusion was an entirely different matter.  It occurred on December 22, 2017:  just twelve days after Bartlett occupied the trailer, and while she was

---

[6] *Id.* at 232-33, 486.  Note that, despite Bartlett's stated interest in the mobile home located on Lot 15, Hames initially leased it to another individual.  *Id.* at 132.  That trailer again became available several weeks later, however, and Bartlett moved in with her young daughter.  *Id*. at 137.

[7] *See* doc. no. 152-2 (Bartlett dep.), at 232-33, 486.  Bartlett testified that Hames agreed she would not have to pay a security deposit.  *Id.* at 142.

[8] *Id.* at 362-64.  Notwithstanding Bartlett's testimony about the arrangement outlined in text, there is evidence in the record that Hames sent Bartlett a text message on December 13, 2017, asking whether she had "more for rent."  *Id.*, Defendants' ex. 3, at ECF 224.  Bartlett replied:  "No not until January.  I got to get my kid Christmas too somehow, gonna be off for the week of Christmas[;] water and power is almost my weekly check."  *Id.*  Hames replied, "[H]ope you can handle it."  *Id.*

**NOTE**:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically:  *i.e.*, "Electronic Case Filing."  *See The Bluebook: A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  When citations include page numbers generated by the header electronically imprinted on scanned copies of filed documents, the court will, as here, precede the pagination references with the letters "ECF."

[9] *See* doc. no. 152-2 (Bartlett dep.), at 164-66.

showering.[10]  When Bartlett heard Hames's voice, she walked into the living room, clothed only in a towel, and asked him to return later.  Hames did not leave, but replied:  "That's ok, I'd rather see you naked anyways."[11]  Bartlett dressed and returned to the living room.[12]  Hames said that he was there to inspect Bartlett's refrigerator, which she had complained was in need of repair.[13]  After inspecting the appliance, Hames promised that his maintenance man would work on it the following day.[14]  Hames then began asking intrusive questions about Bartlett's sexual activities and proclivities, such as:  whether she was having sex with anyone; whether she was sleeping with her daughter's father; whether she "was doing oral" with anyone; and, whether she allowed men to ejaculate inside her.[15]  He also asked whether she "would be willing to have sex for rent?"[16]  Bartlett declined, saying:  "That's the reason I work, so I can pay you cash."[17]  Hames responded, "Well, you can't live here for free," but added, in recognition of the fact she was "a working single mother," that he would be "willing to work something out."[18]  Bartlett made an excuse to leave

---

[10] Doc. no. 58 (Amended Complaint), ¶ 24; doc. no. 152-2 (Bartlett dep.), at 349.

[11] Doc. no. 152-2 (Bartlett dep.), at 352.

[12] *Id.* at 349-55.

[13] *Id.* at 358.

[14] *Id*. at 358-60.

[15] *Id*. at 365-68.

[16] *Id.* at 375.

[17] Doc. no. 152-2 (Bartlett dep.), at 376.

[18] *Id*. at 374.

("Hey, I've got to go.  I've got to go get my daughter"), and Hames walked out.[19]

Text messages exchanged by Hames and Bartlett on December 27, 2017, add context to the foregoing events.  Hames initiated the exchange by asking, "When [are] you making payment?"[20]  Bartlett responded by complaining that her refrigerator still had not been repaired, and that other conditions in and around her trailer were so unacceptable that she was "not too happy right now."  She wrote, for example:

> Do you realize I haven't got to relax or do anything besides work on the trailer?  After I spent all that time cleaning the fridge[,] it doesn't even work[;] I've been having to keep buckets of ice in there to keep my groceries from spoiling again [after] it ruined $100 of groceries.  The front door will not lock and is bent all over to where anyone can just walk in and the back door knob/lock stays stuck to where I can't open it.  No filter for the AC/heat unit, roaches and rats everywhere, carpet is very nasty, I have worked on the trailer everyday non stop from the last people moving out and leaving it in a mess.  I've had to take a whole truck load of garbage to the dumpster and still have junk and trash piled up all over the back yard, it's awful.  TVs, garbage, Bed to a truck, tons and tons of junk and garbage, a large tote of deer heads that smells bad . . . . *I'm not too happy right now*

Doc. no. 152-2 (Bartlett dep.), Plaintiffs' ex. 1, at ECF 225-26 (alterations and emphasis supplied).[21]  Bartlett believed that she should not be required to pay the balance owed on her December rent due to the problems described above, as well as

---

[19] *Id.* at 376.

[20] *Id*., Plaintiffs' ex. 1, at ECF 225 (alteration supplied).

[21] *See also id*., Defendants' ex. 3, at ECF 214-16 (same).  Hames replied to the text message as follows:  "Why didn't you tell me about [the] refrigerator not working and other problems??  *I'm not too happy right now either*."  *Id*., Plaintiffs' ex. 1, at ECF 226-27 (alteration and emphasis supplied); *see also id*. at ECF 216 (same).

several additional, unresolved issues,[22] such as:  the defective refrigerator had caused groceries to spoil; "a water heater leak" had increased her "water and power bill"; the lack of "underpinning" caused a loss of interior heat; and, the back door was "dry rotted" and had "mold around it."[23]

Hames replied:  "I make repairs when I'm told there is a problem.  I paid your electric bill for at least a week (70 dollars).  If you don't want to pay [your] rent and deposit maybe you should just move out.  I will bring notice to vacate today."[24] Bartlett's response was pointed:

> Well I just told you didn't i [*sic*]
>
> Just because you have money doesn't mean you can do and say whatever[;] you need to learn some respect.
>
> Your maintenance man was the one who knew about most of this and just told me a few days ago so you might need a better worker *and I won't deal with you sexually harassing me* or [illegible] me.  I took pictures of everything and *have you recorded on my phone being a pervert so you need to get a grip on life.*

*Id*. at ECF 228-29 (alterations and emphasis supplied).[25]

---

[22] Bartlett testified that Hames had agreed to deduct $20 from the $100 balance owed for the December 2017 rent because she had cleaned the refrigerator. Doc. no. 152-2 (Bartlett dep.), at 364.

[23] *Id*., Plaintiffs' ex. 1, at ECF 227; *see also id*., Defendants' ex. 3, at ECF 216-17 (same).

[24] *Id*., Plaintiffs' ex. 1, at ECF 228; *see also id*., Defendants' ex. 3, at ECF 217-18 (alteration supplied).

[25] *See also id*., Defendants' ex. 3, at ECF 217-19.

Hames placed a "Notice To Vacate" on Bartlett's door that same day.[26]

Nine days later, Hames filed a complaint in the Cullman County District Court, seeking Bartlett's eviction for "Failure to pay rent as agreed."[27]   Bartlett's *pro se* answer to the complaint denied that she owed Hames any rent, and alleged that Hames was "*just upset from me refusing his sexual offers for rent*."[28]

The disposition of Hames's state-court eviction suit is not contained in the record, but Bartlett vacated the trailer on or about January 21, 2018.[29]   That same day,

---

[26] The "Notice To Vacate" read as follows:

Please be advised that your possessory interest in the mobile home and property located at **670 COUNTY ROAD 248, LOT 15, CULLMAN, ALABAMA 35057** is hereby **terminated**.

You are receiving this notice due to your failure to pay rent as agreed.  Please vacate the mobile home at **670 COUNTY ROAD 248, LOT 15, CULLMAN, ALABAMA 35057** within seven (7) days of this notice.  Otherwise legal action will follow.

Dated, delivered and posted at mobile home, this the 27th day of December, 2017.

Doc. no. 152-2 (Bartlett dep.), Plaintiffs' ex. 2, at ECF 234 (emphasis in original).

[27] *Id.*, Plaintiffs' ex. 3, at ECF 235.

[28] *Id.*, Plaintiffs' ex. 4, at ECF 236 (emphasis supplied); *see also id.*, Plaintiffs' ex. 6, at ECF 241 (Jan. 20, 2018 text from Bartlett to "Melody"), stating that Hames

pretty much took my money to move in and had me move last tenants['] stuff out so I could move mine in and clean it top to bottom and then evicts me with a lie and suing me for 3 months rent just after 2 weeks and this place was so bad day to night every single day between work I done nothing but disinfect and clean the entire time with no off days and being sick as a dog as well as my child wouldn't doubt if I lost my job from having to leave early etc dealing with it.  *Sexually harassing me stalking me and very mad bc* [because] *I wanted to pay him with money for rent instead of sexual favor*  [alterations and emphasis supplied].

[29] Doc. no. 152-2 (Bartlett dep.), at 233.

7

she and her daughter moved into a shelter for abused women.[30]

After Bartlett filed her *pro se* answer, Hames visited her sister and said: "[Y]our sister is getting me in a lot of trouble."[31]  He boasted of knowing the local district attorney and employees of the Alabama Department of Human Resources, and stated that "it would be a shame if [Bartlett's] daughter was taken away."[32]  Hames also told Bartlett's sister that he "knew people at the shelter," and would tell them that she had not been physically abused.[33]  Shortly afterwards, Bartlett was told by shelter staff that she and her daughter could not continue to reside in the facility.[34]

## B.   Kayla Carreker

Kayla Carreker leased a trailer from Randy Hames from November 4, 2017 through January 26, 2018.[35]  She lived in the unit with her two-year-old son, Ethan, and, for a brief period, her unemployed boyfriend, Zack Franklin.[36]  Her monthly rent was $375.[37]

---

[30]  *Id.* at 48-52.

[31]  *Id.* at 390.

[32]  *Id*. at 391.

[33]  *Id.*

[34]  *Id*. at 402, 407.

[35]  *See* doc. no. 180 (Plaintiffs' Brief in Opposition to Summary Judgment), ¶ 5 at 8 ("On or about November 4, 2017, Carreker moved into the trailer and physically moved out of it *a couple days after January 24, 2018*." (emphasis supplied) (citing doc. no. 152-3 (Carreker dep.), at 63-64)).

[36]  Doc. no. 152-3 (Carreker dep.), at 74, 80.

[37]  *Id*. at 78-79.

On December 9, 2017, a couple of weeks after Carreker's boyfriend moved out,[38] she allowed Hames to enter the trailer.[39]  He sat next to her on the sofa, and "put his hand on her upper, inner thigh close to her privates and another hand on her back" — actions that disturbed Carreker "so much that she stood up and walked away."[40] She asked Hames "for a house key to change the situation and get [him] out of her trailer."[41]  When Hames walked to his automobile to retrieve a door key, Carreker activated the recording feature on her cell telephone.

> When Hames first came back into the trailer with the house key, Carreker was standing in the kitchen and Hames was standing at the front door physically blocking Carreker in the kitchen.  Hames then walked closer to Carreker and got close enough to touch her and whisper in her ear that he would knock off rent payments if she would have sex with him.  *The cell phone was in the living room on the table . . . and was too far away to record what Hames whispered in Carreker's ear, but it recorded the rest of their conversation.  . . . Hames began talking about sex and what he liked, and he asked Carreker if she would have sex with him*, and after she stated she had been raped when she was 13, *he asked her if she would perform oral sex on him.*  Carreker was panicking and told Hames that she would think about having sex with him just to get him to leave because she did not know what he was going to actually do.

---

[38] Hames had offered to allow Zack Franklin to "work off [Carreker's] rent" by performing repairs around the mobile home park, but Carreker derived little benefit from the offer because she and Franklin ended their relationship, and he moved out of her trailer, on November 22, 2017, less than two weeks after leasing the unit.  *Id*. at 80-81, 154.

[39] *Id*. at 151-53, 165.

[40] Doc. no. 180 (Plaintiffs' Brief in Opposition to Summary Judgment), ¶ 10 at 9 (citing doc. no. 152-3 (Carreker dep.), at 166, 393).

[41]*Id.* (alteration supplied) (citing doc. no. 152-3 (Carreker dep.), at 169-71).

Doc. no. 180 (Plaintiffs' Brief in Opposition to Summary Judgment), ¶ 11, at 10-11 (ellipses and emphasis supplied, deposition citations omitted).[42]  Hames said that he would "work with" Carreker on rent, but emphasized "you can't live here for free."[43]

Carreker shared copies of the recording with her mother and former boyfriend.[44]  Hames confronted her a few days later, saying that the boyfriend had told him about the recording.  Hames said:  "I did nothing wrong, and . . . anyway, I'm a lawyer, so nobody is going to believe you."[45]  He asked for her rent payment, but she didn't have the money.[46]

On December 12, 2017, three days after the incident described above, Hames taped an eviction notice on Carreker's door.  He later told her that the eviction notice was "to cover his butt . . . in case he did have to evict [her],"[47] but added that he would "continue to work with her" to catch up on her past-due rent.[48]

---

[42] *See also* doc. no. 181-1 (audio recording).

[43] Doc. no. 152-3 (Carreker dep.), at 392.  On two later occasions — once while Carreker was sleeping on her couch, and another, while she was showering — Hames again entered Carreker's home without notice or invitation.  During each intrusion, she told him to leave.  *Id*. at 381-83.

[44] *See supra* note 38 (observing that Carreker's boyfriend moved out on November 22, 2017, prior to the incident described in text).

[45] Doc. no. 152-3 (Carreker dep.), at 397 (ellipsis supplied).

[46] *Id*. at 202.

[47] *Id*. at 398-99.

[48] *Id.* at 399.  Carreker made cash payments to Hames toward the rent due, but Hames did not provide Carreker with receipts for those payments.  *Id*. at 395.  Strangely, he also taped a letter to the door stating that Carreker rented the trailer for $350 a month.  That was for Carreker's use in connection with an application for food stamps and childcare assistance.  Doc. no. 180 (Plaintiffs' Brief in Opposition to Summary Judgment), ¶ 15, at ECF 15; *see also id.* ¶¶ 7-8, at ECF 11-12

On January 24, 2018, more than a month after taping the eviction notice to Carreker's door, and while she was assisting a customer at the drive-through window of the "Wendy's" restaurant at which she was employed, Hames "stormed up" and began "screaming and yelling at [her] about rent money *and then kind of whisper*[ed] [']*well, there's* [sic] *other ways you can pay your rent. Don't forget*.[']"[49]

Hames placed a second eviction notice on Carreker's door that same day.[50] She vacated the trailer two days later.[51] She did not pay the past-due rent.[52]

Hames filed an unlawful detainer action against Carreker in state court on February 13, 2018.[53] She responded with a *pro se* answer alleging that she had vacated the trailer due to Hames's "sexual harassment."[54]

For a brief period after moving out, Carreker lived with her son's father, Matt

---

(stating that Carreker did not receive food stamps and other childcare assistance while residing in Hames's trailer because she needed a lease agreement or other proof of residency in order to apply for the benefits). *See also* doc. no. 152-3 (Carreker dep.), Defendants' ex. 1, at ECF 145 (copy of Dec. 11, 2017 letter).

[49] *Id*. at 322 (alterations and emphasis supplied). Hames left the restaurant after Carreker said: "[Y]ou need to leave. This is not the place for this. I can talk to you when I get home, but you can't be here acting like this right now. I am at work." *Id.*

[50] *Id.* at 324.

[51] *Id*. at 214.

[52] *Id.* at 144, 202-03.

[53] *See* doc. no. 154-7, at ECF 3.

[54] *Id*. at ECF 2 ("Randy Hames has evicted me. *I left due to the* mold infested home & *sexual harassment*. I asked many times for repairs to be made and never heard anything more about fixing things. When I moved in I was without a working fridge" (emphasis supplied)). The disposition of the state court action is not contained in the record.

11

Whitehead.[55]  She then moved to the same Cullman shelter for abused women at which Tomeka Bartlett had briefly resided.[56]

Carreker returned to the mobile home park on several occasions after vacating her trailer, to retrieve personal items.[57]  She last did so on March 14, 2018, and found that the trailer's lock had been changed.[58]  When she, nevertheless, attempted to gain access, other residents recorded her unsuccessful efforts to enter.  Carreker returned to her automobile, and attempted to "run over" one of the residents who had been filming her.[59]  Hames's daughter, Miranda Hames Self, drove into the marina at about the same time, to collect money that had been deposited in a cash box on the boat launch.  Carreker drove her automobile directly at Self's vehicle, as if to ram it, but swerved away just before contact.  Self called 911, and a Cullman County Deputy Sheriff responded.  The deputy's body camera recorded that he asked Self whether Carreker had been evicted by court order.  When Self replied "no," that a final

---

[55] Doc. no. 152-3 (Carreker dep.), at 51.

[56] *Id.* at 51-54.  Three or four weeks after Carreker moved into the shelter, staff determined that she had not been physically abused, and told her that she could not stay.  *Id.* at 54.

[57] *Id.* at 143.

[58] *Id.* at 149.

[59] The facts stated in the remainder of this paragraph are based on the statements of witnesses preserved in "body camera" video footage provided to plaintiffs' counsel by the Cullman County Sheriff's Office.  *See* doc. no. 235 (Plaintiffs' Response to Defendant Daughters' Brief Regarding Plaintiff Kayla Carreker's Arrest in Compliance with Court's March 16, 2023 Instructions), ex. A. The "body camera" footage was not included in plaintiffs' initial evidentiary submission, and plaintiffs did not move to supplement their submission.  Nonetheless, a description of the incident depicted in the video and viewed by this court is included for completeness.

hearing had not been conducted, the deputy said: "If she has not been legally evicted by the judge, she has a right to retrieve her belongings."[60] When Self asked whether she could, nevertheless, press charges for Carreker's attempt to "ram" her automobile, the deputy agreed to file a report that Self might use to obtain a warrant.

A warrant was later issued for Carreker's arrest on the charge of reckless endangerment; but, following a bench trial in the Cullman County district court, she was convicted only of reckless driving.[61]

## C.   Randy Hames's Arrests

Randy Hames was arrested for solicitation of prostitution and stalking in the second degree on February 22, 2018, pursuant to warrants issued by the Cullman County District Court, and based upon complaints filed by plaintiffs, Tomeka Bartlett and Kayla Carreker.[62]

Hames was again arrested on March 5, 2018, on charges of human trafficking in the second degree.[63] Each complaint supporting the March 5 arrest warrants

---

[60] *Id.*

[61] Doc. no. 221 (Defendant Daughters' Brief Regarding Plaintiff Kayla Carreker's Arrest in Compliance with Court's March 16, 2023 Instructions), at 2. Carreker appealed her conviction to Circuit Court, where the case remains pending. According to records maintained electronically by the State Administrative Office of Courts, the case is currently set for trial on September 11, 2023.

[62] *See* doc. nos. 154-13 (Warrant No. WR 2018-395, K. Carreker), 154-14 (Warrant No. WR 2018-396, K. Carreker), 154-15 (Warrant No. WR 2018-397, T. Bartlett), and 154-16 (Warrant No. WR 2018-398, T. Bartlett).

[63] *See* doc. nos. 154-11 (Warrant No. WR 18-483, T. Bartlett) and 154-12 (Warrant No. WR 18-484, K. Carreker). The charges were enhanced to human trafficking in the first degree on March

contained this statement: "NOTICE:  Any interest in property that RANDY ALLAN

HAMES acquired or maintained as a result of committing said violation is subject to

forfeiture pursuant to Section 13A-6-156 of the Code of Alabama of 1975."[64]

## D.    Filing of *Lis Pendens*

Following Hames's March 5 arrests, the Cullman County District Attorney

filed two *lis pendens* in the District Court.[65]  "*Lis pendens*" is the Latin name for a

notice, warning third parties who might be interested in purchasing the real property

described in the notice that the property is subject to litigation, and that any interests

acquired during the pendency of suit will be subject to the outcome of litigation.  The

District Attorney also recorded copies of the notices in property records maintained

---

10, 2018.  *See* doc. no. 155-13 (Records of alacourt.com).

[64] Doc. nos. 154-11 (Warrant No. WR 18-484), at ECF 2, and 154-12 (Warrant No. WR 18-485), at ECF 2.  The statutory provision cited in the warrants provides that:

> A person who commits the offense of human trafficking in the first degree or human trafficking in the second degree shall forfeit to the State of Alabama any profits or proceeds and any interest in property that he or she has acquired or maintained that the sentencing court determines to have been acquired or maintained as a result of committing human trafficking in the first degree or human trafficking in the second degree.  Any assets seized shall first be used to pay restitution to trafficking victims and subsequently to pay any damages awarded to victims in a civil action.  Any remaining assets shall go toward the cost of the investigation and prosecution and the remaining assets shall be remitted to funding the Alabama Crime Victims Compensation Fund.

Ala. Code § 13A-6-156.

[65] *See* doc. no. 154-18, at ECF 2-3.

14

by the Cullman County Probate Judge.[66]

## E.     Real Property Transfers

On the date of Hames's arrests for human trafficking, he owned several parcels of real property in Cullman County worth at least $1.9 Million.[67]  Two days after his arrests, Hames and Mary Catherine Hames, one of his five daughters, exchanged the following text messages:

> Mary Hames:      Jessica [*i.e.*, daughter Jessica Hames Penner] says they [law enforcement officials] have 11 names [of female tenants and former tenants of the trailer park who claimed sexual harassment];  *you gotta get the deeds done*.
>
> Randy Hames:     *Will do*.
>
>                  * * * *
>
> Randy Hames:     *Mailed you ck [check] today for $15,000*.
>
> Mary Hames:      . . . *I'll be there for court and will hang on to the $ for you*.

---

[66] The first *lis pendens*, recorded at 2:58 p.m., related to "Warrant No.: WR-2018-484," the case initiated by Kayla Carreker.  *See* doc. no. 154-18, at ECF 5-6; doc. no. 154-12 (Complaint, District Court of Cullman County, Alabama), at ECF 2.  The second *lis pendens*, recorded at 3:01 p.m., related to "Warrant No.: WR-2018-483," the case initiated by Tomeka Bartlett.  *See* doc. no. 154-18, at ECF 2-3; doc. no. 154-11 (Complaint, District Court of Cullman County, Alabama).

[67] *See* doc. nos. 154-20 through 154-23 (Warranty Deeds relating to property located within Cullman County, Ala.), and doc. no. 155-11 (Cullman County records demonstrating that the 2018 value of the properties for *ad valorem* tax purposes was at least $1,928,400).  Hames also owned property located at 1216 Ridgecrest Lane N.E. in Hartselle, Morgan County, Alabama, (*see* doc. no. 155-11), but the amended complaint contains no reference to the conveyance of that property to Hames's daughters.

Doc. no. 154-1, at ECF 2-3 (alterations and emphasis supplied).  The next day, Hames

and Mary continued messaging, as follows:

> Randy Hames:  *Worked on deeds today.  Angela* [*i.e.*, another daughter,
> Angela Hames Sahurie] *suggests deeding each tract to
> the 5 of you as joint tenants and later making equitable
> division* [if] *civil suit avoided or beaten*.  You have
> opinion on that[?]  Felt stressed today because of
> uncertainty.  Ala state bar will be filing motion for
> interim suspension of [my] bar license until felony
> [charges are] resolved.  So fairly tough day.

> Mary Hames:  I feel like if you can make decisions go ahead and do it,
> but if it would take too much time could do joint [*i.e.*,
> convey the real properties to all five daughters as joint
> tenants, rather than individually].  You could also do
> some easier ones fully and then the harder parcels joint
> between some or all and divide later.  Sorry to hear
> about the interim suspension – that's tough.

> Like for some parcels if you know it will be divided
> into Angela and Christi [*i.e.*, Christi Hames Dolbeer]
> have just both of them on it.  It can be tough for all 5 of
> us to agree.

> We will support whatever you decide.

> *I agree with Angela that time is a critical factor though*.

> Randy Hames:  Thank you.  I think Angela wants to be sure each of you
> get 1/5 if possible.  I may just do it that way and get
> everyone to sign off for me to later make equitable
> division.  *Could preserve the property that way*.  Hope
> Allison [*i.e.*, Allison Graves, Hames's secretary] isn't
> mad.  We had several deeds done.

16

> Mary Hames:     Whatever you need to do.  *Protecting yourself is the #1 goal*

*Id*. at ECF 4-5 (alterations and emphasis supplied).

Four days later, March 9, 2018, Hames conveyed all of his Cullman County properties, including the land encompassing the mobile home park and marina, to his daughters as joint tenants with right of survivorship.[68]  Each deed recited that it had been executed "for and in consideration of Ten and no/100 dollars and other valuable consideration."[69]

Hames subsequently informed his daughters in a letter, dated May 30, 2018, that:

> After careful consideration, I believe that the best way to handle the distribution of the properties is for me to designate who gets what property.  I will make every attempt to make [a] distribution as equitable as possible.

---

[68] *See* doc. nos. 154-20 through 154-23 (Warranty Deeds conveying title from Randy Allan Hames to the daughter defendants).  Hames conveyed the following parcels to his daughters as joint tenants: 17-05-15-2-028-006 (427 Second Avenue SW, Cullman, Alabama); 21-05-22-0-001-014 (County Road 369, Cullman, Alabama); 21-07-36-0-001-023.037, .039-.041 (County Road 247, Cullman, Alabama); 21-07-36-0-001-023.069 (County Road 247, Cullman, Alabama); 21-07-36-0-001-026 & 027 (Hames Marina property); 21-07-36-0-001-031 (2036 County Road 223, Cullman, Alabama); 21-07-36-0-001-031.001 ("apart split to 31.003") (County Road 247, Cullman, Alabama); 21-07-36-0-001-031.003 (split from 21-07-36-0-001-031.001, County Road 247, Cullman, Alabama); 21-07-36-0-001-023.042 (County Road 247, Cullman, Alabama).  *Id.*  **NOTE**: An October 25, 2018 "correction deed" for property identified in the *ad valorem* tax records of the Cullman County Tax Assessor as parcels "21-07-36-0-001-031.001, 031.003" recited that the deed was "issued to correct an error in a Warranty deed recorded in DEED BK 670 PG 285 in Cullman County Probate on 03/09/2018.  The error was in the legal description of the property conveyed."  Doc. no. 155-6.

[69] *See, e.g.*, doc. no. 154-20 (Warranty Deed for parcel 17-05-15-2-028-006), at ECF 2.

17

I am preparing authorization for each of you to sign.  I will provide this as quickly as possible so that I can move forward with appraisals, surveys, etc. as needed.  Some of the properties can probably be sold and the proceeds divided among you equally.

In preparation for this, I ask that each of you submit to me your Top 3-5 pieces of property or if you choose, request that proceeds be provided to you rather than property.  Please sign off and return the authorization to me as soon as possible.

Doc. no. 155-4.

Daughter Angela Hames Sahurie, an attorney licensed by the Alabama State

Bar, exchanged the following text messages with her father on September 30, 2018:

| Angela Sahurie: | Between the RV park and your parents house we would rather get the RV park. |
|---|---|
| Randy Hames: | I understand.  Think we need to take another look at Division.  Marina + RV park = $915,000. |
| | Parents house + 21 acres = $100,000 |

Doc. no. 155-7, at ECF 2.  Seventeen days later, Hames and Angela  exchanged these

messages:

| Randy Hames: | Angela, if you really have your heart set on the point, and you think it is worth it, Christi [*i.e.*, daughter Christi Hames Dolbeer] said she would trade it to you for the RV Park. |
|---|---|
| Angela Sahurie: | I will pay for an appraisal.<br>For the point & the office building.  You just had the rv park appraised, didn't you? |

Randy Hames:    Everything has been recently appraised!!!

I made agreement with Miranda [*i.e.*, daughter Miranda Hames Self] today for her to purchase MHs [mobile homes] in the MH park.

We need quit claim to Marina and MH Park, bills of sale to Mobile homes, and dissolution of LLC by Friday.

Angela, you've waited until the last minute to contest the values. *I fear this is going to cause problems for everyone and delay Greg's* [*i.e.*, defense attorney Greg Yaghmai's] *ability to protect all of us.*

*Id.* at ECF 2-3 (alterations and emphasis supplied).

The property was subsequently divided among the daughter defendants between October 16 and 30, 2018, by their execution of quitclaim deeds.[70] The parcel encompassing the mobile home park and marina was conveyed to defendant Miranda Hames Self by her sisters in a quitclaim deed dated October 16, 2018.[71] The quitclaim deed states that "[t]he Grantors [*i.e.*, the daughter defendants] do hereby grant previous owner Randy Hames a life estate in the Mobile Home located at the

---

[70] *See* doc. nos. 155-21 through 155-24 (Quitclaim Deeds).   The record does not contain a quitclaim deed that corresponds to the correction deed.

[71] The description of the property conveyed to Ms. Self by quitclaim deed differs significantly from the description of the property described in the warranty deed encumbered by the *lis pendens* filed by the Cullman County District Attorney on May 5, 2018. *Compare* doc. no. 154-21 (Warranty deed relating to parcel 21-07-36-0-001-026, 001-027.000), at ECF 8-9, *with* doc. no. 155-24 (Quitclaim deed relating to parcel 21-07-36-001-027.000 "split to 27-001, 27-002"), at ECF 7-9.

Marina."[72]

## F.    Cash Transfers

Hames also reduced his cash holdings following the arrests described in Part II.C., *supra*.  For example, Hames issued $15,000 checks to each of his five daughters on March 7, 2018.[73]   Four days later, he drafted twenty-four checks totaling $174,999.98, as follows:   five $15,000 checks to each of Hames's sons-in-law;[74] eighteen checks, totaling $79,999.98, to his grandchildren;[75] and, a $20,000 check to "Genet Assistant, L.L.C.," the company of his daughter, Mary Catherine Hames.[76] He issued seven more checks, totaling $45,151, between July 3 and July 5, 2018:  *i.e.*, four $10,000 checks to daughter Angela Hames Sahurie;[77] a $5,000 check to daughter Miranda Hames Self;[78] and, two checks totaling $151 to the Cullman County Probate Judge and Alabama Secretary of State for payment of the costs for recording a

---

[72] Doc. no. 155-24, at ECF 7 (alterations supplied).  The deed also bears this caveat: "DESCRIPTION FURNISHED BY PARTIES — NO TITLE SEARCH WAS MADE OR REQUESTED.  PREPARER IN NO WAY WARRANTS TITLE OR DESCRIPTION.  SOURCE OF TITLE:  DEED BOOK 347, PAGE 991."  *Id.*

[73] Doc. no 154-2, at ECF 5-9.

[74] Doc. no. 154-3, at ECF 6-10. Hames drew these five checks from the Hames Marina bank account. *See id.*

[75] *See* Doc. no. 154-2, at ECF 10-27. Twelve of those eighteen checks were in the amount of $5,000, *id.* at ECF 10-17, 24-27, and the other six were in the amount of $3,333.33, *id.* at ECF 18-23.

[76] Doc. no. 155-14, at ECF 2; *see also* doc. no. 161 (Plaintiffs Brief in Support of Summary Judgment) at ECF 8.

[77] Doc. no. 155-19, at ECF 2-5.

[78] Doc. no. 155-18, at ECF 2.

certificate creating the "Carolyn Jett Hames Building, L.L.C."[79]  All together, Hames

wrote thirty-six checks aggregating $295,150.98 between March 7 and July 5, 2018.

Each was issued either directly to, or for the benefit of, members of his family.[80]

## G.    Formation of Marina Management Company and Dissolution of Hames Marina

Miranda Hames Self assumed managerial responsibilities for Hames Marina,

L.L.C., doing business as "Hames Marina and Mobile Home Park," during February

of 2018, prior to the date on which her father conveyed all of his Cullman County real

property to the daughter defendants.[81]   Even so, Self did not form Marina

Management Company, L.L.C., as a vehicle for transferring the management of

Hames Marina, L.L.C. from her father to herself, until July 3, 2018.[82]  Moreover,

Randy Hames did not dissolve Hames Marina, L.L.C. until October 18, 2018, more

than three months after Self's formation of Marina Management Company, L.L.C.[83]

---

[79] Doc. no. 155-20, at ECF 2-3 (*i.e.*, the $51 check was payable to the Cullman County Probate Judge, and the $100 check was drawn to the Secretary of State).

[80] **NOTE**:  Plaintiffs contend that Hames reduced his cash holdings by as much as 87%, from approximately $530,000 to $72,000 in 2018.  *See* doc. no. 161 (Plaintiffs' Brief in Support of Summary Judgment), at 5-11.  However, that sum includes cash transactions that have been omitted from discussion in this Part of the opinion:  *e.g.*, two April 6, 2018 checks to a Jasper, Ala. Honda dealership for a "2018 CRV" ($29,823.46) and a "2018 Accord" ($24,296.66) (*see* doc. no. 154-4, at ECF 2-3); two $9,000 cash withdrawals on March 21 and July 2, 2018 (*see* doc. no. 155-16, at ECF 2; and doc. no. 155-17, at ECF 2); and, a $9,000 check payable to Hames (doc. no. 155-15, at ECF 2).

[81] *See* doc. no. 181-13 (Self dep.), at 46.

[82] *Id.*

[83] *See* doc. no. 152-21 (Business Entity Record, Alabama Secretary of State).

## II.  DISCUSSION

A.    **Document No. 152:** *Motion for Partial Summary Judgment by Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C.*

The initial paragraph of the motion for partial summary judgment filed by these

three defendants specifies that

> Randy Hames and Hames Marina LLC seek summary judgment on: Count I (FHA - Sexual Harassment);[84] Count II (FHA – § 818);[85] Count IV (Outrage);[86] and Count VI (Human Trafficking).[87]  Marina Management Company seeks summary judgment on those same counts and additionally to [*sic*] Count III (Invasion of Privacy),[88] [and] Count V (Assault & Battery).[89]

Doc. no. 152 (Motion for Partial Summary Judgment), at 2 (footnotes and alterations

supplied).  It should be noted that defendants do not mention Count VII of plaintiffs'

amended complaint, seeking rescission of the deeds executed by Randy Hames in

favor of his daughters.[90]  Nevertheless, defendants argue on pages 26-27 of their

---

[84] See doc. no. 58 (Amended Complaint) ¶¶ 67-79, at 15-16.

[85] *Id*. ¶¶ 80-89, at 16-17.  Section 818 of the Fair Housing Amendments Act of 1988, codified as 42 U.S.C. § 3617, provides:  "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

[86] See doc. no. 58 (Amended Complaint) ¶¶ 97-103, at 18-19.

[87] *Id*. ¶¶ 108-118, at 20-21.

[88] *Id*. ¶¶ 90-96, at 17-18.

[89] *Id*. ¶¶ 104-107, at 19.

[90] *Id*. ¶¶ 119-122, at 21-22 ("Count VII – Equitable Recission" [*sic*]).

motion that plaintiffs are not entitled to equitable, injunctive relief.[91]

## 1. Standards of review

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all *reasonable* inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (emphasis supplied) (citation and quotation marks omitted). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the

---

[91] *See* doc. no. 152 (Motion for Partial Summary Judgment), at, *e.g.*, 27-28 ("Plaintiffs are not entitled to equitable relief because there is no risk of irreparable injury now that Hames Marina no longer exists and Randy Hames does not rent any properties.").

> outcome of the case. The relevant rules of substantive law dictate the
> materiality of a disputed fact. A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (alteration and emphasis supplied).

**2. Count I** — *Sex discrimination claims under the Fair Housing Act*

The Fair Housing Act — Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 — makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of [the] . . . *rental of a dwelling* . . . because of [the person's] race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (alterations, ellipses, and emphasis added).

That language is similar to the wording of the statutory provision in Title VII of the Civil Rights Act of 1964, which makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (ellipsis supplied).

Consequently, courts look to Title VII cases when interpreting the Fair Housing Act. *See, e.g.*, *Fox v. Gaines*, 4 F.4th 1293, 1296 (11th Cir. 2021) ("When

24

interpreting the FHA, we — like our sister circuits — look to cases interpreting Title VII, which uses language virtually identical to the FHA's.") (citing *Kyles v. J.K. Guardian Security Services, Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) (recognizing that the FHA "is the functional equivalent of Title VII . . . and so the provisions of these two statutes are given like construction and application")).[92]

Actionable sex discrimination under both Titles VII and VIII encompasses acts of harassment based upon a plaintiff's gender. *Id*. at 1297.

### a. Sexual harassment in the workplace

Title VII's prohibition of sex discrimination in the workplace does not mention, let alone define, acts that can be characterized as "harassment." Even so, the Supreme Court long ago held that employees are protected from sexually motivated acts of workplace harassment in basically two circumstances: (1) when tangible employment benefits are explicitly conditioned upon the employee's performance of sexual favors; and (2) when the severity or frequency of unwelcome sexual comments or acts creates an offensive or hostile work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-67 (1986).

---

[92] *See also, e.g.*, *Gamble v. City of Escondito*, 104 F.3d 300, 304 (9th Cir. 1997); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *Larkin v. Michigan Department of Social Services*, 89 F.3d 285, 289 (6th Cir. 1996); *Pfaff v. United States Department of Housing & Urban Development*, 88 F.3d 739, 745 n.1 (9th Cir. 1996); *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir. 1993); *Morgan v. Secretary of Housing and Urban Development*, 985 F.2d 1451, 1456 n.4 (10th Cir. 1993); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988).

Title VII claims grouped under the first of those two categories are labeled *quid pro quo harassment*, and are based upon evidence that an employer or supervisor demanded that an employee provide sexual favors in order to gain an employment benefit, or to avoid an adverse employment action.  Title VII claims grouped under the second category are referred to as *hostile environment harassment*, and are based upon evidence of a workplace permeated with unwelcome intimidation, ridicule, insults, or sexual advances related to the employee's gender.

### i. *Quid pro quo* harassment

The prototypical example of sexual harassment in the workplace occurs when an employee's salary, promotional opportunities, or continued employment is conditioned upon compliance with an employer's or supervisor's demands for sexual favors.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998).[93]  In *quid pro quo* cases, the "acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment."  *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982).

---

[93] *See also, e.g.*, *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*) ("The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. . . . In such a case, traditionally described as quid pro quo harassment, the 'discrimination with respect to terms or conditions of employment [is] explicit.'").

### *ii.* Hostile environment harassment

In the absence of a tangible, adverse employment action, unwelcome sexual advances are actionable under Title VII only if they are "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67 (citations omitted).[94]

Title VII hostile environment claims implicate five elements of proof.  The plaintiff must show that:  (1) she belongs to a protected group (*e.g.*, she is female); (2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; (3) the harassment was based on the plaintiff's sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the plaintiff's employment, and created a discriminatorily abusive working environment; and (5) there is a basis for holding the employer responsible under a theory of either vicarious or direct liability.  *Mendoza*

---

[94] The *Meritor* Court relied upon that portion of the Eleventh Circuit's seminal decision in *Henson* observing that

> [s]exual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality.  Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

477 U.S. at 66-67 (quoting *Henson*, 682 F.2d at 902).

*v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).[95]  The fourth of those elements is the one that "tests the mettle" of most hostile environment claims. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).  That is so, in large part, because of the *objective lens* through which severity or pervasiveness is assessed:  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).[96]

When attempting to determine whether harassment is objectively severe or pervasive, courts consider "the severity of the conduct"; "whether the conduct is physically threatening or humiliating, or a mere offensive utterance"; "the frequency

---

[95] *See also, e.g.*, *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson*, 682 F.2d at 903-05.

[96] *See also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), in which the Supreme Court observed that

> [t]he prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." . . . We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace — such as male-on-male horseplay or intersexual flirtation — for discriminatory "conditions of employment."

*Id*. at 81 (ellipsis supplied, internal quotation omitted) (quoting *Harris*, 510 U.S. at 21).

of the conduct"; and, "whether the conduct unreasonably interferes with the employee's job performance." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza*, 195 F.3d at 1246).

To be deemed pervasive, "incidents of environmental sexual harassment must be more than episodic; they must be sufficiently continuous and concerted." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998) (citation and internal quotation marks omitted); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. . . . Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. . . . We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . .

*Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted).

### b. Sexual harassment in leased housing

Even though sex discrimination claims asserted under Titles VII and VIII are

subject to the same general analytical framework, harassment claims based upon the Fair Housing Act differ from those that occur in a workplace in important ways.[97] That is partially because a woman who is sexually harassed at work "can go home to find peace and safety," but a woman who is "harassed by her landlord has no such safe haven."[98]   Nevertheless, the application of Title VII's *general* analytical framework to Fair Housing Act claims is appropriate; indeed, even regulations promulgated by the Department of Housing and Urban Development mirror claims available in Title VII cases, in that claims for both *quid pro quo* and hostile environment harassment may be asserted under the Fair Housing Act.  *See* 24 C.F.R. § 100.600(a)(1)-(2).  The Eleventh Circuit likewise recognizes the parallel.  *Fox*, 4 F.4th at 1296 n.6 (defining *quid pro quo* and hostile environment claims in the context of the Fair Housing Act).

### i. *Quid pro quo* harassment

"'Quid pro quo' harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors."  *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993).  Tomeka Bartlett presented evidence demonstrating that, on at least one

---

[97] Michelle Adams, *Knowing Your Place: Theorizing Sexual Harassment at Home*, 40 Ariz. L. Rev. 17, 17 (1998) ("Sexual harassment at home raises different issues from sexual harassment at work.").

[98] Kathleen Butler, *Sexual Harassment in Rental Housing*, 1989 U. Ill. L. Rev. 175, 181 (1989).

occasion, Randy Hames suggested that she could "pay" her rent by providing him sexual favors. When she refused, he placed an eviction notice on the door of her trailer, and commenced an unlawful detainer action. Hames denies that he offered to forgive her rent if she complied with his request.[99] The conflicting evidence presents an issue of material fact and, accordingly, summary judgment must be denied on Bartlett's *quid pro quo* claim.

Kayla Carreker's evidence also is sufficient to survive summary judgment. She presented an audio recording of Hames asking her to perform oral sex acts, and saying that he would "work with" her on rental payments. Carreker also refused Hames's uninvited requests, and he placed an eviction notice on her trailer door shortly thereafter. Hames does not dispute that the recorded conversation occurred, but takes issue with Carreker's interpretation that he was asking for sexual favors in exchange for rent.[100] Accordingly, a genuine issue of material fact is again presented, and summary judgment must be denied on Carreker's *quid pro quo* claim.

### ii. Hostile environment harassment

Rental housing may be characterized as "hostile" when a landlord deprives his tenant "of her right to use or enjoy her home" by way of "severe or pervasive"

---

[99] Doc. no. 158-1 (Hames dep., Feb. 17, 2021), at 266-67.

[100] *Id*. at 418-22.

harassment.  *Fox*, 4 F.4th at 1296 n.6 (quoting *Quigley v. Winter*, 598 F.3d 938, 946-47 (8th Cir. 2010)).  While proof of "pervasiveness" normally requires more than a single incident of misconduct, even a single incident may be deemed to violate the Fair Housing Act when "the incident is sufficiently *severe* to create a hostile environment."  24 C.F.R. § 100.600(c) (emphasis supplied).  In other words, the "severe *or* pervasive" element of a hostile environment claim is *disjunctive* and *distinctive*, regardless of whether the harassment is alleged to have occurred in the workplace or a home.

Further, a hostile environment claimant need not necessarily allege physical contact or behavior of an otherwise "purely sexual" nature.  *E.g.*, 24 C.F.R. § 100.600(b) ("Harassment can be written, verbal, or other conduct, and does not require physical contact."); *Honce*, 1 F.3d at 1090; *Noah v. Assor*, 379 F. Supp. 3d 1284, 1290 (S.D. Fla. 2019).  Evidence of a landlord's  harassment of other female tenants is also relevant.  *Honce*, 1 F.3d at 1090.

The determination of whether a hostile environment exists "depends upon the totality of the circumstances . . . from the perspective of a reasonable person in the aggrieved person's position." 24 C.F.R. § 100.600(a)(2)(i)(A)-(C) (ellipsis supplied). That tracks with Title VII jurisprudence, which explicitly demands evaluation of the broader circumstances in which the alleged harassment occurred. *Mendoza*, 195 F.3d

32

at 1242 (holding that, "[i]n sexual harassment cases, the courts must consider the alleged conduct in context").  In that regard, harassment by a landlord within a tenant's rental dwelling is an especially egregious circumstance that should be taken into account when evaluating the severity of the alleged harassment.  *Noah*, 379 F. Supp. 3d at 1292; *see also Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1292 (E.D. Cal. 2013) ("The fact that the harassment took place in [plaintiff's] home is even more egregious *when viewed in light of the fact that* [plaintiff] *lives alone and* [defendant] *trespassed into her home uninvited and completely unexpectedly*." (alterations and emphasis supplied)); *Quigley v. Winter*, 584 F. Supp. 2d 1153, 1157 (N.D. Iowa 2008) ("A tenant should be able to feel secure in her own home."), *rev'd and remanded on other grounds*, 598 F.3d 959 (8th Cir. 2010); *Beliveau v. Caras*, 873 F. Supp. 1393, 1397 n.1 (C.D. Cal. 1995) ("[W]hen the harassment occurs in a woman's home, it is a complete invasion in her life.").

Against that backdrop, the flaw in conflating application of Title VII's legal framework with unqualified reliance on Title VII cases for purposes of factual comparison becomes clear.  In the context of housing rented by a single female, "the nature of the harassing conduct itself [is] inextricable from the home."[101]  Naturally,

---

[101] Nicole A. Forkenbrock Lindemyer, Comment, *Sexual Harassment on the Second Shift: The Misfit Application of Title VII Employment Standards to Title VIII Housing Cases*, 18 Law & Ineq. 351, 352 (2000); *accord* Adams, *supra* note 97, at 17.

then, determining whether a particular housing environment was rendered objectively hostile without an eye toward context would not only amount to unfaithful application of the governing legal framework — it would present an impossible task.

Even so, the "relatively few" Title VIII housing harassment decisions[102] often gloss over considerations unique to the home[103] — particularly in instances of harassment "committed inside a woman's home by someone who literally holds the keys" to the front door.[104]

Stated differently, a sexual harassment claim based upon conduct that occurred within a leased residence "is not simply a home-based variant of sexual harassment at work, but instead is conceptually distinct."[105]  There exists a "strong contrast" between the home where, "[i]n most cases, the landlord-harasser holds a master key

---

[102] "There are relatively few published opinions from the federal courts involving sexual harassment in housing — at least when compared with employment harassment cases."  Rigel C. Oliveri, *Sexual Harassment of Low-Income Women in Housing*, 83 Mo. L. Rev. 597, 605 (2018); *accord* Adams, *supra* note 97, at 19 (observing that the relative dearth of reported opinions "does not mean . . . that sexual harassment at home occurs with any less frequency than sexual harassment at work").

[103] Adams, *supra* note 97, at 39 (noting that "housing and employment are conceptually distinct, and the differences between them have rarely been acknowledged or explored by the courts"); Lindemyer, *supra* note 101, at 352 (recognizing widespread "fail[ure] to address core issues particular to the context of the home"); *id.* at 358 (noting that "the number of sexual harassment in housing cases in no way parallels the rate of sexual harassment in employment claims being brought in federal courts"); Carlotta J. Roos, Note, DiCenso v. Cisneros*: An Argument for Recognizing the Sanctity of the Home in Housing Sexual Harassment Cases*, 52 U. Miami L. Rev. 1131, 1145 (1998).

[104] Oliveri, *supra* note 102; *see also* Lindemyer, *supra* note 101, at 352 (observing that "routine transposition of standards and paradigms created in the context of the workplace onto fact situations fundamentally unique to the home has resulted in a gross misfit of legal standards").

[105] Adams, *supra* note 97, at 20-21.

34

to the victim's home," and the office, where "most workplaces today have human resources personnel to whom the victim can turn."[106]

The Fair Housing Act protects a renter's dependence on a landlord for life's bare necessities — *e.g.*, heat, plumbing, shelter — preconditions for entering the workforce and earning a living, where Title VII governs relationships. That reality affords malfeasant landlords leverage over tenants far more sinister than that which often gives rise to Title VII disputes.[107] For example, Fair Housing Act harassment cases often involve

> landlords' repeated attempts to compromise the safety value of female tenants' housing units, either through their use of passkeys to gain unauthorized entry to tenants' apartments in order to procure sex, assaults on tenants in their showers . . . sexually explicit "come-on's" to tenants in front of their children, and demands of sex in exchange for rent.

Michelle Adams, *Knowing Your Place: Theorizing Sexual Harassment at Home*, 40 Ariz. L. Rev. 17, 35 (1998) (ellipsis supplied). And while Title VII operates against barriers preventing women from entering and advancing in the workforce, the Fair Housing Act prevents invasion into a woman's most private arena — the sanctuary

---

[106] Roos, *supra* note 103, at 1145-46.

[107] Threat of eviction and/or refusal to execute necessary repairs "can be devastating to a tenant who has meager housing options," or "when the housing does not meet the basic standards of health and safety." Deborah Zalesne, *The Intersection of Socioeconomic Class and Gender in Hostile Housing Environment Claims under Title VIII*, 38 B.C. L. Rev. 861, 882 (1998); *accord* Adams, *supra* note 97, at 35 ("To influence tenants, landlords can threaten to evict or refuse to make necessary repairs to the dwelling.")

of her home.  *Id.* at 21.[108]

At the end of the day, the court conducts the same inquiry — determining whether the harassment complained of was either sufficiently pervasive in nature or so severe in degree — in order to answer the same ultimate question:  *Would a reasonable person in plaintiff's position view the home environment as having been rendered legally hostile or abusive?*

Where an informed inquiry necessarily involves assessment of the underlying circumstances in their totality, it follows that a hostile *home* environment claim necessarily implicates the following:  (1) considerations underlying fundamental American-law safeguards applicable to the home across an array of contexts;[109] (2)

---

[108] The sanctity of the home is a bedrock legal principle.  *See, e.g.*, Ralph Waldo Emerson, *English Traits* 167 (1856) ("The house is a castle which the king cannot enter."); *accord* William Pitt the Elder, Address before the House of Commons in 1766 (quoted in Nelson B. Lasson, *The History and Development of the Fourth Amendment of the United States Constitution* 49-50 (1970)) ("The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.").

[109] *E.g.*, *Carey v. Brown*, 447 U.S. 455, 471 (1980) ("Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from tribulations of their daily pursuits, is surely an important value."); *id.* ("Our decisions reflect no lack of solicitude for the right of an individual 'to be let alone' in the privacy of the home, 'sometimes the last citadel of the tired, the weary, and the sick.'") (quoting *Gregory v. City of Chicago*, 394 U.S. 111, 125 (1969) (Black, J., concurring)); *Fixel v. Wainwright*, 492 F.2d 480, 483 (5th Cir. 1974) ("The sacredness of a person's home and his right of personal privacy and individuality are paramount considerations in our country . . . ."); *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) (describing "home" as the place "where the need for defense of self, family, and property is most acute"); *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990) ("Judicial concern to protect the sanctity of the home is so elevated that free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority.")*; Stanley v. Georgia*, 394 U.S. 557, 568 (1969) (striking down statute prohibiting private possession of obscene material).  Safeguards for the home are not limited to

the distinct discrimination-based evils at which Titles VII and VIII are aimed;[110] and

(3) the particular circumstances that lend themselves to at-home sexual harassment.[111]

Neither plaintiff presented evidence supporting a conclusion that Hames's alleged conduct was "pervasive."  Even so, each presented evidence of "severity" sufficient to survive summary judgment.

### (A)  Tomeka Bartlett

Construed in the light most favorable to Bartlett, the evidence presents a genuine dispute of material fact — *i.e.*, whether Hames conducted himself in such a way as to render Bartlett's home environment objectively hostile.

For instance, when Bartlett and her child resided with Bartlett's mother, sister,

---

instances of governmental intrusion; as one scholar noted in the context of stand-your-ground laws: "To ignore the privilege to stand one's ground in the home . . . is to say to the victim that, as far as shelter from external violence is concerned, *you have no home*."  Thomas Katheder, *Criminal Law—Lovers and other Strangers: Or, When Is a House a Castle?*, 11 Fla. St. U. L. Rev. 465, 482 (1983); *see also* Adams, *supra* note 97, at 22-23; Roos, *supra* note 103, at 1140 ("The sanctity of the home doctrine is well ingrained in our society and jurisprudence. Accordingly, legislatures and courts commonly protect individual rights that are exercised within or related to the home a higher degree than other rights.").

[110] Adams, *supra* note 97, at 21 (noting that, while Title VII prevents sex-based barriers to the public sphere, Title VIII protects sex-based invasion of one's most private spaces); Butler, *supra* note 98, at 181; Roos, *supra* note 103, at 1145-46 ("Harassment within the home raises unique problems which are not adequately addressed by Title VII case law. . . .  While both acts are generally aimed at eliminating discrimination, they apply in very different contexts.").

[111] *See, e.g.*, Adams,  *supra* note 97, at 20 ("The cases that have considered allegations of sexual harassment at home also demonstrate that low- and moderate-income women who are tenants have a significantly greater chance of experiencing sexual harassment in their rental housing than do female homeowners").  *See also, e.g.*, Zalesne, *supra* note 107, at 882 (discussing reality that tenants with "meager alternative housing options" are particularly susceptible to harassment); William Litt *et al*., Comment, *Sexual Harassment Hits Home*, 2 U.C.L.A. Women's L.J. 227, 232 (1992) ("For low income tenants, housing options are extremely limited.").

and niece, Hames suggested that the pair move into one of his vacant trailers. When Bartlett replied that she could not afford the rent, Hames proposed a payment plan. As a result, Hames was twice able to gain unauthorized entry to Bartlett's home without immediately alerting her relatives. During the second instance, Hames entered while Bartlett was showering. When Bartlett asked him to leave, Hames responded by sexually propositioning her.[112] In an apparent attempt to justify his unannounced entry after those sexual overtures, Hames said that he was there to inspect Bartlett's broken refrigerator and, upon inspection, promised to have it repaired the following day. But after addressing the refrigerator issue, Hames did not leave. Instead, he continued to make sexually charged inquiries, including an offer to exchange rent for sexual favors. Bartlett declined, stating that she maintained employment for the purpose of paying her rent. In response, Hames acknowledged that Bartlett was a "single working mother,"[113] but because he was unwilling to forgo compensation of some kind, implicitly propositioned her for sex once again. Bartlett ultimately left her own home to escape Hames.

Five days later, on December 27, 2017, Bartlett confronted Hames by way of

---

[112] See the text accompanying notes 10-19, *supra*. Hames makes much of the fact that Bartlett testified that this event occurred on December 22, 2017. Hames maintains that he was in North Carolina on that date. *See* doc. no. 152 (Motion for Partial Summary Judgment of Randy Hames, Hames Marina, and Marina Management), at 16-17. That contention makes it even more clear that there are genuine issues of material fact that should be resolved by a jury.

[113] Doc. no. 152-2 (Bartlett dep.), at 374.

text message addressing both her still-unrepaired refrigerator and his uninvited entry.[114]   Bartlett told Hames that damage to her front door prohibited her from locking it, that damage to her back door prevented her from opening it, and that her new home was infested with cockroaches and rats.[115]   Hames denied knowledge of the broken refrigerator and called Bartlett a "liar."[116]   The same day, Hames placed a notice to vacate on Bartlett's door,[117] and Bartlett and her child ultimately moved to a shelter for abused women.[118]

The evidence, construed in the light most favorable to Bartlett, shows that Hames injected hostility and abuse into Bartlett's home by twice entering without invitation, and by withholding necessary repairs following her rejection of his sexual advances — all while expressly acknowledging the practical pressures associated with Bartlett's scant resources.   In that way, the interactions are illustrative of the precise harm against which the Fair Housing Act is aimed.   An uninvited intrusion into the home inflicts not only the most obvious, immediate harm, but also represents

---

[114] *Id.* (Plaintiffs' ex. 1), at ECF 225 *et seq.*

[115] *Id.*, at ECF 225-27.

[116] *Id.* at ECF 228-29; *see also id.* at ECF 226 ("Why didn't you tell me about the refrigerator not working and other problems?").   Whether Hames actually knew of the issues with Bartlett's refrigerator — and, if so, whether he actually refused to execute repairs because she denied his advances — is yet another genuine issue of material fact that precludes summary judgment on Bartlett's hostile housing environment claim.

[117] *Id.* (Plaintiffs' ex. 2), at ECF 234.

[118] Doc. no. 152-2 (Bartlett dep.), at 48-52.

the threat of unannounced reentry, a fear that actualized when Hames returned to Bartlett's home a second time and refused to leave when asked, causing Bartlett to flee.  In sum, a reasonable jury could find that the evidence tends to show that Hames's actions flowed directly from Bartlett's refusal to exchange sexual favors for rent; and, therefrom, a reasonable jury could conclude that Hames sexually harassed Bartlett in a manner so severe as to render her leased home environment objectively hostile.

### (B)  Kayla Carreker

Kayla Carreker has likewise presented evidence from which a reasonable jury could conclude that Hames subjected her to harassment so severe as to render her home environment objectively hostile.  Hames entered her trailer on more than one occasion, including without her knowledge when she was asleep on the couch.[119] And much like he isolated Bartlett from her mother, sister, and niece by renting her one of his vacant trailers, Hames awaited the departure of Carreker's boyfriend before entering her home unannounced and sexually propositioning her.[120]  Hames also

---

[119] See the discussion in Part I.B., *supra*.

[120] *Cf. Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000), a case in which the Eleventh Circuit evaluated the conduct of a male supervisor who placed "his hand on [the female plaintiff's] knee once," and touched "the hem of her dress once," but concluded that — even though those acts were the "most serious" of "all the conduct about which" the plaintiff complained, they still were not actionable under Title VII because "those were only two incidents in a period of six or seven months during which [the plaintiff and her supervisor] were interacting (out of an even longer period during which the two worked for the University).  *Each incident was only momentary,*

accosted Carreker at work; but, unlike cases of workplace harassment, Carreker was forced by circumstance to return home to an environment in which Hames exercised unrestricted access.

The court has sufficiently iterated concerns unique to the home environment, and Carreker and Bartlett allege largely the same harms.[121]   Moreover, Hames's alleged harassment of similarly situated female tenants,[122] including Bartlett, is probative of misconduct here.[123]   Construing all evidence in the light most favorable to Carreker, a reasonable jury could deem Hames's conduct severe, and ultimately find that the conduct infected Carreker's home with unlawfully discriminatory hostility.   Stated differently, the evidence is sufficient to support a jury's determination that a reasonable tenant, situated as Carreker, would perceive her home environment as hostile or abusive as a result of Hames's conduct.[124]   Based upon the

_____

*and neither was coupled with any verbal suggestions or advances.*" *Id*. at 585 (emphasis supplied) (citing *Minor v. Ivy Tech State College*, 174 F.3d 855, 857 (7th Cir. 1999) (holding as a matter of law that no hostile environment claim was established by evidence showing that the supervisor, among other things, on one occasion "put his arms around [the plaintiff], kissed her, squeezed her, and said, 'Now, is this sexual harassment?'")).

[121] See the discussion in Part II.A.2.b.ii., *supra*.

[122] *See, e.g.*, the complaint filed by the U.S. Department of Justice in the lead case:  *United States vs. Randy Hames and Hames Marina, L.L.C., doing business as Hames Marina and Mobile Home Park*, Civil Action No. 5:18-cv-1055-CLS.

[123] *See Honce*, 1 F.3d at 1090.

[124] For example, a jury could find the following deposition testimony credible, and find that Carreker's alleged perception was objectively reasonable under the circumstances: "That was my landlord. I had to tread [lightly] because I didn't know what his intentions were. I didn't know what he was going to do, . . . and he had the right to evict me if I didn't do what he wanted."  Doc. no.

totality of circumstances, the question of whether Hames's behavior rises to the level of "severe" harassment is a genuine issue of material fact.  Accordingly, summary judgment must be denied as to Carreker's hostile housing environment claim.

2.  **Count II** — *Fair Housing Act claims under 42 U.S.C. § 3617*

Plaintiffs allege in Count II that defendants "coerced, intimidated, threatened or interfered with Plaintiffs' exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under the Fair Housing Act in violation of 42 U.S.C. § 3617." Doc. no. 58 (Amended Complaint), ¶ 83, at 17.  Cases addressing claims for relief under § 3617 are scarce.  Even so, two theories of liability have emerged:  one for "interference claims," and another for so-called "retaliation claims."  *See, e.g.*, *Moore v. Camden Property Trust*, 816 F. App'x 324, 335 (11th Cir. 2020) (defining elements of an interference claim); *Philippeaux v. Apartment Investment and Management Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) (defining elements of a retaliation claim); *Fox v. Gaines*, Case No. 19-81620-CIV-SINGHAL, 2022 WL 1746812, at *5-6 (S.D. Fla. May 31, 2022) (analyzing interference and retaliation claims separately).  Plaintiffs allege that all defendants are liable under both theories.[125]  This portion of the opinion addresses their claims against Hames and,

---

152-3 (Carreker dep.), at 172 (alteration and ellipsis supplied).

[125] *See* doc. no. 180 (Private Plaintiffs' Statement of Facts and Memorandum of Law in [Opposition to] Motion for Partial Summary Judgment), at 32-33 (interference), 35-36, 45-50 (retaliation); *see generally* doc. no. 226 (Private Plaintiffs' Response to Court's Request Regarding

vicariously, Hames Marina, L.L.C.  The liability of Marina Management Company, L.L.C., is addressed *infra*, in Part II.A.6., and the liability of the daughter defendants in Part II.C.

### a. Interference

To prevail on a § 3617 interference claim, a plaintiff must prove that: "(1) the plaintiff exercised or enjoyed 'any right granted or protected by' Sections 3603-3606; (2) the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Moore*, 816 F. App'x at 335; *see also Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991); *Noah*, 379 F. Supp. 3d at 1289.[126]

The term "interfere" is not defined by either the statute or interpretive regulations promulgated by the Department of Housing and Urban Development,[127] but courts have accorded the word its ordinary meaning:  that is, "the act of meddling in or hampering an activity or process."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New International Dictionary* 1178

---

§ 3617 Claims Against Hames).

[126] The opinion of the Southern District of Florida in *Noah* framed the inquiry slightly differently: "To state an *interference* claim, [a plaintiff] must allege: (1) defendant interfered; (2) with; (a) plaintiff's exercise of a right under Sections 3603-3606; (b) plaintiff's enjoyment of a housing right after exercise of that right; or (c) plaintiff's aid or encouragement to a protected person to exercise or enjoy a housing right; (3) because of discriminatory animus." 379 F. Supp. 3d at 1289 (emphasis in original).

[127] *See* 24 C.F.R. § 100.400 (Prohibited interference, coercion, or intimidation).

(14th ed. 1961)).  "Interference is 'broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws,'" and it does not necessarily implicate force or threat of force.  *Revock v. Cowpet Bay West Condominium Association*, 853 F.3d 96, 113 (3d Cir. 2017) (quoting *Walker*, 272 F.3d at 1128).

Plaintiffs contend that the same conduct supporting their harassment claims under § 3604(b) of the Fair Housing Act is also sufficient to support their interference claims under § 3617 of the same Act.[128]  This court agrees.  As previously discussed in Parts II.A.2.b.i. & ii. of this opinion, *supra*, genuine issues of material fact on the question of whether each plaintiff suffered discrimination based upon her sex in violation of § 3604(b) preclude entry of summary judgment in favor of Hames.

Therefore, plaintiffs' § 3617 interference claims depend, at least in part, on the resolution of their respective § 3604(b) claims.  Stated differently, there is a genuine issue of material fact as to whether Hames's conduct interfered with the exercise of each plaintiff's right under the Fair Housing Act to enjoy her residence free from unlawful discrimination because of her sex.  *See Noah*, 379 F. Supp. 3d at 1290

---

[128] Doc. no. 226 (Private Plaintiffs' Response to Court's Request Regarding § 3617 Claims Against Hames), at 17-18.  Defendants do not directly address plaintiffs' interference claim, arguing only that plaintiffs cannot prevail on the § 3617 *retaliation* claim because they were delinquent in paying rent.  *See* doc. no. 231 (Defendant Randy Hames' Reply to Private Plaintiffs' Supplemental Response to Court's Request Regarding § 3617 Claims Against Hames), at 4.

("Plaintiff asserts numerous allegations that, if true, plausibly allege unlawful interference on the basis of sex under the Fair Housing Act, under both *quid pro quo* and hostile environment sexual harassment theories."); *Richards v. Bono*, No. 5:04CV484-OC-10GRJ, 2005 WL 1065141, at * 6 (M.D. Fla. May 2, 2005) ("Surely, severe and pervasive sexual harassment of a tenant by a landlord in the tenant's own home is interference with the tenant's enjoyment of her dwelling because of sex."); *see also* Quid Pro Quo and Hostile Environment Harrassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63054, 63056 (Sept. 14, 2016) (providing that § 3617, "which makes it unlawful to 'coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of' rights protected by the Act, or on account of a person having aided others in exercising or enjoying rights protected by the Act, could be violated by conduct that creates a *quid pro quo* or hostile environment").

In addition (and alternatively), plaintiffs argue that Hames's conduct following their abandonment of their trailers in the face of eviction proceedings ("post-eviction conduct") provides an independent basis for § 3617 liability, separate and apart from whether Hames is ultimately found liable on each plaintiff's substantive claim.[129]

---

[129] *See* doc. no. 58 (Amended Complaint), ¶¶ 29-31 (Bartlett) and 47 (Carreker); doc. no. 226 (Plaintiffs' Response to Court's Request Regarding § 3617 Claims Against Hames), ¶¶ 24-26 & 29-32, at 7-9 (describing post-eviction conduct not alleged in amended complaint).

Plaintiffs present this theory in an apparent effort to maintain an avenue to § 3617 recovery, in the event their Fair Housing Act § 3604 harassment claims should fall on deaf ears at trial.

When a § 3617 claim is not based upon a substantive violation, a plaintiff must show that the conduct at issue is severe or pervasive.  *See Gourlay v. Forest Lake Estates Civic Association of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1236 (M.D. Fla. 2003), *vacated due to settlement*, No. 8:02CV1955T3-TGW, 2003 WL 22149660 (M.D. Fla. Sept. 16, 2003).

In this case, plaintiffs have presented little to no evidence to prove the alleged post-eviction conduct.  And, even to the extent that the allegations of post-eviction conduct are supported by record evidence, the record does not support plaintiffs' contention that Hames's post-eviction conduct rises to the requisite level of either severity or pervasiveness that is sufficient to overcome Hames's motion for summary judgment on the § 3617 interference claim.

For example, plaintiffs assert that Hames interfered with their interim housing in a shelter for abused women, but provide no evidence that he had anything to do with their expulsion from the facility.[130]  Even if they had, the court concludes that

---

[130] *See* doc. no. 180 (Plaintiffs' Statement of Facts and Memorandum of Law [in Opposition to] Motion for Partial Summary Judgment), at 49; doc. no. 226 (Plaintiffs' Response to Court's Request Regarding § 3617 Claims Against Hames), at 18; doc. no. 237 (Transcript of Motions Hearing, Mar. 16, 2023), at 17-21.

Hames's alleged post-eviction conduct is beyond the scope of § 3617's protections. *See Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003) (observing that the concept of interference does *not* encompass "any action whatsoever that in any way hinders a member of a protected class").

In sum, plaintiffs' § 3617 interference claims survive summary judgment only insofar as they are based upon the same, pre-eviction conduct underlying plaintiffs' § 3604 harassment claims.

### b. Retaliation

Notably, neither Count II of plaintiffs' amended complaint, nor the text of Fair Housing Act § 3617, contains the word "retaliation":

> It shall be unlawful to *coerce, intimidate, threaten, or interfere with any person* in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617 (emphasis supplied). Some of the ordinary meanings accorded the emphasized statutory terms are as follows:

- *Coerce* is defined as "1: to compel to an act or choice; 2: to achieve by force or threat; 3: to restrain or dominate by force."[131]

- *Threaten* means "1: to utter threats against; 2a: to give signs or warning of; b: to hang over dangerously; 3: to announce as intended or possible; 4: to cause

---

[131] *See* https://www.merriam-webster.com/coerce (last visited May 24, 2023).

to feel insecure or anxious."[132]

- *Intimidate* is defined as "to make timid or fearful: frighten *especially*; to compel or deter by or as if by threats."[133]

- *Interfere* means, in relevant part: "1: to enter into or take a part in the concerns of others; 2: to interpose in a way that hinders or impedes."[134]

The ordinary meanings of those terms are broad enough to encompass retaliatory conduct:  *i.e.*, *retaliate* means "to return like for like, *especially*: to get revenge."[135] *See* 24 C.F.R. § 100.400(c)(5) (providing that conduct made unlawful by § 3617 "includes, but is not limited to," acts that amount to retaliation "against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act").

"To establish a *prima facie* case of retaliation [under § 3617], a plaintiff must show that (1) [she] engaged in a protected activity; (2) the defendant subjected [her] to an adverse action; and (3) a causal link exists between the protected activity and the adverse action."  *Philippeaux,* 598 F. App'x at 644.  "[A] plaintiff must show that a reasonable [tenant] would have found the challenged action materially adverse,

---

[132] *See* https://www.merriam-webster.com/threaten (last visited May 24, 2023).

[133] *See* https://www.merriam-webster.com/intimidate (last visited May 24, 2023).

[134] *See* https://www.merriam-webster.com/interfere (last visited May 24, 2023); *see also Walker*, 272 F.3d at 1129 (defining interference as "the act of meddling in or hampering an activity or process") (quoting *Webster's Third New International Dictionary* 1178 (14th ed. 1961)).

[135] *See* https://www.merriam-webster.com/retaliate (last visited May 24, 2023).

48

'which in this context means it well might have "dissuaded a reasonable [tenant] from making or supporting a charge of discrimination."'" *Burlington Northern and Santa Fe Railway*, *v. White*, 548 U.S. 53, 68 (2006) (alterations supplied) (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006) (in turn quoting *Washington v. Illinois Department of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005))).

If plaintiffs establish a *prima facie* case, the burden shifts to defendants to suggest a legitimate, non-discriminatory reason for the adverse action. The plaintiffs then must show that the proffered reason is pretextual. *Walker*, 272 F.3d at 1128.

Plaintiffs advance two arguments with respect to their retaliation claims. First, they argue that Hames commenced eviction proceedings in retaliation for their rejection of his sexual advances. Second, they argue that Hames's post-eviction conduct independently constituted retaliation in violation of § 3617.

Each plaintiff satisfied the elements of a retaliation claim by presenting evidence that she was subjected to *quid pro quo* and hostile environment housing discrimination, as detailed at length in this opinion. In particular, plaintiffs have offered evidence to show that they opposed Hames's sexual advances (protected activity), and were served with a "notice to vacate" (adverse action) shortly thereafter (causation).[136]

---

[136] Hames placed a notice to vacate on Bartlett's door five days after he sexually propositioned her in exchange for rent. Doc. no. 152-2 (Bartlett dep.), Plaintiffs' ex. 2, at ECF 234.

Defendants contend that each plaintiff's rent delinquency was a legitimate reason for Hames's initiation of eviction proceedings.  Accordingly, the court must determine whether plaintiffs have presented evidence to show that defendants' stated reason for those adverse actions is a pretext for discrimination.

The record contains evidence that Hames allowed other female tenants to remain in their residences despite delinquent rent payments.  In particular, plaintiffs submitted the affidavits of five female tenants, each attesting that, if she was unable to pay her rent on time, Hames allowed her extra time to become current.[137]  Each affidavit contains the statements: "[i]f I was ever behind on my rental payment, [Randy Hames] would always allow extra time to make my payment.  If my residence was ever in need of maintenance or repairs, the repairs were properly made."[138]  Lindsey Hayes added that, "[i]f and when I was late on my rent[, Randy Hames] gave me ample opportunity and time to get situated and caught back up."[139]  Monica

---

Hames initially placed a notice to vacate on Carreker's door three days after she recorded his sexual advances, but he told her he would "continue to work with her."  Doc. no. 152-3 (Carreker dep.), at 399.  He placed a second notice to vacate on her door five weeks later, on January 24, 2018, following which she moved out on January 26, 2018.  *See id*. at 214.  The close temporal proximity of the notices to vacate following plaintiffs' rejection of Hames's advances is sufficient to create a genuine dispute on the issue of causation.  *See, e.g.*, *Fox*, 2022 WL 1746812, at *5 (citing *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008)).

[137] Doc. no. 172-23 (Affidavits of Autumn Hansen, Lindsey Hayes, Sonya Newman, Monica LaFont, and Rachel Allen).

[138] *Id.* (alteration supplied).

[139] *Id.* at ECF 4 (alterations supplied).

LaFont stated that Hames "has worked with me on my rental payments[;] if I needed extra time to pay, he allowed me to have extra days to pay."[140]  According to Rachel Allen, Hames "has worked with me amazingly on my rental payments."[141]  Hames also accepted partial payments of rent from Tomeka Bartlett's sister, Ashley Bartlett.[142] Hames also "worked with" plaintiffs themselves, until each made clear her unwillingness to satisfy him sexually.  Accordingly, the court concludes that a reasonable jury could find that defendants' proffered reason for initiating eviction proceedings is a pretext for discrimination, and that summary judgment is therefore improper.

To the extent that plaintiffs' § 3617 retaliation claims are based upon Hames's post-eviction conduct, however, summary judgment in favor of defendants is proper. Plaintiffs' claims based on such conduct must fail for the reasons previously stated in the discussion of plaintiffs' interference claims:  *that is*, plaintiffs have not presented evidence that Hames's actions caused them to be expelled from the shelter for abused women, and the conduct is not otherwise such that a reasonable jury could deem it severe or pervasive.

### 3. **Count IV** — *State law "outrage" claim*

---

[140] *Id.* at ECF 8.

[141] *Id.* at ECF 10.

[142] Doc. no. 172-26 (text message exchanges between Hames and Ashley Bartlett).

Alabama's formulation of the "tort of outrage" is conceptually synonymous with an action to recover damages for the intentional infliction of emotional distress. *See, e.g.*, *Ex parte Lumbermen's Underwriting Alliance*, 662 So. 2d 1133, 1134 (Ala. 1995); *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 823 (Ala. Civ. App. 2000).[143]

The Alabama Supreme Court has recognized the tort only in "egregious circumstances," and has limited its application to just three categories of misconduct: (1) wrongful conduct in connection with family burials; (2) barbaric methods employed by an insurance agent for the purpose of coercing settlement of an insurance claim; and (3) egregious sexual harassment. *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (citing *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041 (Ala. 1993)).

Here, neither plaintiff has presented evidence of emotional distress "so severe that no reasonable person could be expected to endure it." *Inmon*, 394 So. 2d at 365. Accordingly, summary judgment is due to be entered in favor of defendants on plaintiffs' state-law outrage claims.

### 4. Count VI — *State law "human trafficking" claim*

Count VI of the amended complaint contends that the actions of defendants

---

[143] This court believes, as a matter of policy, that torts of outrage and intentional infliction of emotional distress should be viewed as conceptually distinct. Nonetheless, since the Alabama courts have failed to recognize this distinction, this court will analyze the two counts as if they were a single cause of action.

Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C.,

"constitute violations of the Representatives Jack Williams and Merika Coleman Act,

Alabama Code § 13A-6-150, *et seq*."[144]  Plaintiffs allege that:

> 111.   Defendants [Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C.,] implemented a scheme, plan or pattern intended to cause Plaintiffs to believe that failure to have sexual relations with him [Randy Hames] would cause them mental suffering.

> 112.   Defendant [Randy Hames] intentionally used this scheme, plan or pattern, which was both overt and subtle, to cause Plaintiffs to believe that if they did not perform sexual acts for him they would suffer mental suffering, *i.e.*, Plaintiffs and their children would be evicted.

> 113.  Defendant [Randy Hames] attempted to extort the Plaintiffs' person — by attempting to induce them into have sexual relations or performing sexual acts in exchange for rent.

> 114.   Defendant [Randy Hames] used coercion and deception to make Plaintiffs believe they would be evicted if they did not perform sexual favors for him.

> 115.   Defendant [Randy Hames] caused or threatened to cause mental suffering to Plaintiffs for not providing him with sexual servitude.

> 116.   Randy Allan Hames' conduct as described herein was acting within the scope of his employment with or agency for Hames Marina, L.L.C., and his actions were either authorized, requested, commanded, performed, or within the scope of Randy Allan Hames' employment on behalf of Hames Marina, L.L.C., the corporation, and/or constituted a pattern of conduct that Hames Marina, L.L.C. knew or should have known was occurring.

---

[144] Doc. no. 58 (Amended Complaint), ¶¶ 109 & 110, at 20.

117.   Defendants, through unlawful actions in violation of §13A-6-150, *et seq*., has caused Plaintiff [*sic*] to incur losses and expenses over $10,000 and such losses continue.

118.   In addition to an award of compensatory damages, Plaintiff [*sic*] is entitled to injunctive relief under Alabama Code §13A-6-157, restraining and enjoining Defendants[,] and all those in privity, concert or participation with Defendants[,] from engaging in such wrongful acts in violation of §13A-6-150, *et seq*.

Doc. no. 58 (Amended Complaint), at 20-21 (alterations supplied).

Alabama Code § 13A-6-157 provides that "an individual who is a victim of human trafficking may bring a civil action."  A "trafficking victim" is defined as "[a]ny person, including minors, subjected to labor servitude, sexual servitude, or involuntary servitude." *Id*. § 13A-6-152(8) (1975). "Sexual servitude" is defined as:

Any sexual conduct as defined in subdivision (3) of Section 14-11-30, Code of Alabama 1975,[145] for which anything of value is directly or

_____

145 The pertinent portions of § 14-11-30 read as follows:

a. Sexual intercourse.  This term shall have its ordinary meaning and occurs upon a penetration, however slight; emission is not required.

b. Sexual contact.  Any known touching for the purpose of sexual arousal, gratification, or abuse, of the following:

1. The sexual or other intimate parts of the victim by the actor.

2. The sexual or other intimate parts of the actor by the victim.

3. The clothing covering the immediate area of the sexual or other intimate parts of the victim or actor.

c. Sexual intrusion.  Any intrusion, however slight, by any object or any part of the body of a person into the genital, anal, or oral opening of the body of another

indirectly given, promised to, or received by any person, which conduct is induced or obtained by coercion or deception from a person.

*Id*. § 13A-6-152(7)(a).  Further, "sexual conduct" is defined as including:

> 1.  Sexually explicit performances, meaning an act or show intended to arouse, satisfy the sexual desires of, or appeal to the prurient interests of patrons or viewers, whether public or private, live, photographed, recorded, videotaped, or projected over the Internet.

> 2. Commercial sex acts, meaning any sex act on account of which anything of value is given, promised to, or received, directly or indirectly, by any person.

> 3.  Acts defined in subdivision (3) of Section 14-11-30, Code of Alabama 1975.

*Id*. § 13A-6-152(7)(b).

The parties have not cited, nor has the court been able to find, any cases addressing this cause of action.  It is not obvious whether a person may bring an action in the absence of a pre-existing criminal conviction (*i.e.*, where there is no judicial finding that a person is, in fact, a "trafficking victim").  The state criminal proceedings against Randy Hames remain pending.

The parties' arguments are not helpful.  Defendants assert in conclusory fashion that the facts of this case do not constitute "trafficking."  Likewise, plaintiffs

---

person if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse.

Ala. Code § 14-11-30(3) (1975).

state only that summary judgment should be denied, because Randy Hames has been criminally charged in state court with first- and second-degree human trafficking.

Regardless of the uncertainty of the elements of this claim, it is clear that "sexual conduct" is required. Both plaintiffs rebuffed Hames's sexual advances and, despite Carreker's testimony that Hames touched her thigh and back, the court cannot say that such an act meets the statutory definition of "sexual conduct." Accordingly, summary judgment will be entered in favor of defendants on plaintiffs' "human trafficking" claims.

## 5. The liability of Marina Management Company, L.L.C.

As noted at the beginning of Part II.A., *supra*, defendant Marina Management Company, L.L.C., seeks summary judgment on the four Counts discussed above, as well as the claims alleged in Counts III and V.[146] Count III states a claim by both plaintiffs against Hames, Hames Marina, and Marina Management Company for invasion of privacy by Randy Hames, "acting in his authority as the owner of Hames Marina."[147] Count V seeks damages from the same defendants by plaintiff Kayla

---

[146] *See* doc. no. 152 (Motion for Partial Summary Judgment by Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C) at 2 (first para.).

[147] Doc. no. 58 (Amended Complaint), ¶ 91, at 17. *See also id.* ¶ 92, at 17-18 ("Hames invaded the privacy of the Plaintiffs, by, among other things, sexually harassing Plaintiffs, which included but was not limited to, entering their home without permission or cause, making sexually inappropriate comments, propositions, touching and conduct. Hames also intruded upon the privacy of the Plaintiffs by asking unwelcomed [*sic*] questions about their private sexual life and history.").

Carreker, alone, for an assault by Randy Hames.[148]

Marina Management contends that it is entitled to summary judgment on all of those claims because

> Plaintiffs have not alleged one particular fact against Marina Management Company, LLC ("MMC") simply because they cannot. This overreach demonstrates the Plaintiffs lack of viable claims. MMC was formed on July 3, 2018 by Defendant Miranda Self. Marina Management has never owned any real property or trailers. MMC did not assume any of Hames Marina's liabilities. It is a management company that handles the rentals of certain trailers.

Doc. no. 152 (Motion for Partial Summary Judgment by Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C), at 25.

Plaintiffs respond that Marina Management remains accountable under "the Federal Common Law successor liability doctrine,"[149] or as a successor-in-interest to Hames Marina, L.L.C., under Alabama law.[150]

---

[148] *Id*. ¶ 106, at 19 ("Hames intentionally or reckless subjected Carreker to unwelcomed [*sic*] and offensive touching").

[149] Doc. no. 180 (Plaintiffs' Statement of Facts and Memorandum of Law in [Opposition to] Motion for Partial Summary Judgment), at 56. Assuming for purposes of discussion that the federal common-law doctrine of successor liability applies to cases brought under the Fair Housing Act, a court must perform a balancing of factors. *See In re National Airlines*, 700 F.2d 695, 698 (11th Cir. 1983) (Title VII case) (relevant factors include "the extent to which the successor corporation essentially continues the operations of the former corporation," and, "whether the new corporation had notice of the former corporation's practices and policies"). The Supreme Court said that the test for successor liability is *fact specific*, and must be conducted "in light of the facts of each case and the particular legal obligation which is at issue." *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 262 n.9 (1974).

[150] Alabama law applies a similar fact-specific inquiry, and holds that when

> one company sells or otherwise transfers all its assets to another

Defendants' attorneys conceded during oral arguments on the motions addressed in this opinion that the issue of whether Marina Management Company, L.L.C., is the successor to Hames Marina, L.L.C., is a question of fact that cannot be resolved on motion for summary judgment.[151]

Therefore, summary judgment is denied as to the claims asserted against Marina Management in Count I (Fair Housing Act § 3604 claims), Count II (Fair Housing Act § 3617 claims), Count III (Invasion of Privacy), and Count V (Assault & Battery), but granted as a matter of law on the claims alleged in Count IV (Outrage) and Count VI (Human Trafficking).

**B.    Document No. 196:** *Motion to Strike of Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C.*

Defendants Randy Hames, Hames Marina, L.L.C., and Marina Management Company, L.L.C., filed a motion asking the court to strike the portion of plaintiffs' brief in opposition to their motion for partial summary judgment that exceeded this

_____

> company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a *de facto* merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor.

*Andrews v. John E. Smith's Sons Co.*, 369 So. 2d 781, 785 (Ala. 1979).

[151] Doc. no. 237 (Transcript of Motions Hearing, Mar. 16, 2023), at 37 ("[A]s far as the analysis on whether [Marina Management] is a successor or not, I think it's a very fact-specific issue. It's not ripe for summary judgment either way.").

court's thirty-page limit.[152]  In support, defendants state they had agreed to plaintiffs' request for permission to move the court for leave to file *either* an opposition brief that exceeded the page limitation by an additional ten pages, *or* a separate brief addressing only the arguments of Marina Management Company.[153]

Even so, the motion filed by plaintiffs did not precisely track the agreement of counsel.

Instead, plaintiffs' attorneys filed a motion requesting "permission to respond to Defendant Marina Management Company's Motion for Summary Judgment separately, or in the alternative, for an extension of fifteen (15) pages to reply to Defendants' Combined Motion for Partial Summary Judgment."[154]  This court granted the former alternative, and ordered plaintiffs to "*file a separate brief in response to the motion for partial summary judgment filed by defendant Marina Management Company.*"[155]

Plaintiffs' attorneys did not submit a separate brief.

Rather, they filed *a sixty-page response* to defendants' motion.  Fifty-five of

---

[152] *See* doc. no. 196 (Motion to Strike); *see also, e.g.*, doc. no. 44 (Scheduling Order entered by the undersigned Judge), ¶ 3, at 2 (30-page limit); doc. no. 21 (Initial Order entered by Magistrate Judge T. Michael Putnam, to whom this case originally was assigned), at 4 (also a 30-page limit).

[153] *See* doc. no. 196 (Motion to Strike), at 2.

[154] Doc. no. 168 (Plaintiffs' Motion), at 3.

[155] Doc. no. 170 (Order), at 2 (emphasis supplied).

those sixty pages (91.7%) were devoted to the arguments advanced by defendants Randy Hames and Hames Marina, L.L.C.[156]  Defendants argued that such a blatant disregard of the court's order by plaintiffs' counsel was prejudicial, and asked the court to strike the final thirty pages of plaintiffs' brief.

The written response of plaintiffs' counsel resembled a shotgun blast.  It scattered such arguments as:  defendants failed to justify the sanction of striking their brief; the motion to strike was untimely; defendants were not prejudiced, as demonstrated by the fact that they filed a response to plaintiffs' sixty-page brief; and, defendants failed to follow the court's citation instructions.[157]

After evaluating the record and submissions of the parties, the court found no prejudice to defendants; and, in open court, during oral argument on the motions discussed in this opinion, denied defendants' motion to strike on that ground.[158]

Even so, the court determined that the blatant failure of plaintiffs' counsel to comply with the order directing them to file a separate response brief could not be ignored, and was sanctionable.[159]

---

[156] *See* doc. no. 203 (Plaintiffs' Opposition to Defendants' Motion to Strike).

[157] *See* doc. no. 180 (Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment).

[158] *See* doc. no. 237 (Hearing Transcript), at 73-74 ("I am not going to strike the unnecessary pages because the defendants responded to what you filed, and we've [*i.e.*, the undersigned judge and law clerks] waded through it all and tried to determine what applies to this defendant [Marina Management Company, L.L.C.], as opposed to another defendant.").

[159] *Id*. at 74 ("I gave you permission to do one thing, and you did another.").

Therefore, in accordance with Federal Rules of Civil Procedure 16(f)(1)[160] and 16(f)(2),[161] plaintiffs' attorneys were ordered to pay the reasonable expenses and fees incurred by defense counsel as the result of noncompliance with the court's order. Specifically, defense counsel were directed to file, within seven days, a statement of the amounts of attorney time, fees, and expenses claimed as reasonable compensation for the time spent in drafting the motion to strike, drafting supporting briefs, and preparing for oral argument. Plaintiffs' response to that statement, if any, was due within seven days.[162]   To date, however, there is no record that defendants filed a statement of the amounts of attorney time, fees, and expenses claimed. Accordingly, their entitlement to now claim such fees and expenses is rescinded for also failing to comply with the court's order.

## C.   **Document No. 149:** *The Daughter Defendants' Motion for Partial Summary Judgment*

The daughter defendants ask the court to enter summary judgment in their favor on the Fair Housing Act claims alleged against them in plaintiffs' amended

---

[160] This Rule provides that:  "On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a . . . pretrial order."  Fed. R. Civ. P. 16(f)(1) (ellipses supplied).

[161] This Rule requires the court to "order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 16(f)(2).

[162] *See* doc. no. 237 (Hearing Transcript), at 74.

complaint.[163]

### 1. **Count I** — *Fair Housing Act § 3604 claims*

The daughter defendants contend that they cannot be held liable under § 3604,

because: none of them were involved in the day-to-day operations of Hames Marina

while plaintiffs resided there; none met either plaintiff while each resided in a leased

trailer at Hames Marina; none had any communications with either plaintiff while

each resided at Hames Marina; and, none possessed any knowledge of the manner in

which their father dealt with either plaintiff until after the dates on which Bartlett or

Carreker vacated the leased trailers.[164]  Plaintiffs counter that, since Randy Hames

conveyed to his daughters the property on which the mobile home park is located,[165]

the daughters are successors to any liability ultimately attributable to Hames Marina,

---

[163] *See* doc. no. 149 (Daughter Defendants' Motion for Partial Summary Judgment).

[164] *See* doc. no. 149-1 (Daughter Defendants' Brief in Support of Motion for Partial Summary Judgment), at 10.  The daughter defendants also argue that they cannot be held legally accountable if defendants Hames and Hames Marina are found not liable as a matter of law on plaintiffs' Fair Housing Act claims.  *Id*. at 11.

[165] *See* doc. nos. 154-20 through 154-23 (Warranty Deeds).  Several months later, the daughters divided the property among themselves by executing quitclaim deeds.  *See* doc. nos. 155-21 through 155-24 (Quitclaim Deeds).  The property encompassing the mobile home park and marina was conveyed to Miranda Hames Self by an October 16, 2018 quitclaim deed from her four sisters.  *See* doc. no. 155-24, at ECF 7-11 (October 16, 2018 Quitclaim Deed from Christi Hames Dolbeer, Mary Catherine Hames, Jessica Hames Penner, and Angela Hames Sahurie to Miranda Hames Self, recorded on October 19, 2018 in Deed Book 677, at page 285, Probate Records of Cullman County, Alabama).  None of the other daughters had an interest in the property encompassing the mobile home park and marina after that date.

L.L.C.[166]

While plaintiffs may be correct that some courts have determined "successor liability" to be a viable theory in Fair Housing Act cases,[167] their argument that the theory applies to individuals is misplaced.  The successor liability doctrine applies to *business entities*, not individuals.  *See, e.g.*, *Burris v. Green*, No. 3:12cv521/MCR/CJK, 2015 WL 13937743, at *5 (N.D. Fla. Mar. 16, 2015) (holding that a successor liability claim "is, by its very nature, a claim against the entity, rather than an L.L.C.'s managing member") (citing *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 382-83 (Bankr. M.D. Fla. 2014) (rejecting the contention that an individual can be held liable under a theory of "successor liability," along with the successor corporation)).  Accordingly, the daughter defendants' motion for summary judgment is due to be granted as to Count I:  the Fair Housing Act claims asserted under 42 U.S.C. § 3604.

## 2.  **Count II** — *Fair Housing Act § 3617 claims*

Following the arrest of Randy Hames, the daughter defendants began communicating among themselves about the legal mess that their father's actions had

---

[166] Doc. no. 179 (Private Plaintiffs' Statement of Facts and Memorandum of Law in Support of Their Opposition to Daughter Defendants' Motion for Partial Summary Judgment), at 16-17.

[167] *See, e.g.*, *Kennedy v. City of Zanesville*, 505 F. Supp. 2d 456, 480 (S.D. Ohio 2007); *Equal Rights Center v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *5 (D. Md. Mar. 31, 2016).

created.  Jessica Penner came up with the less-than-brilliant idea of creating a fake Facebook account in the alias name of "Shelley Blevins," and holding herself out as one of Randy Hames's "victims," in hopes of establishing contact with plaintiffs.[168]

Another of the daughters, Angela Hames Sahurie, drafted and filed with the Alabama State Bar Association a complaint against one of plaintiffs' attorneys, R. Champ Crocker.[169]  The complaint was based upon actions taken and statements made by Crocker in relation to plaintiffs' case, including communications with the media. The Bar took no action on the complaint.  The daughters also expressed their displeasure with plaintiffs, plaintiffs' attorneys, and other individuals who are not parties to this lawsuit through group text messages.[170]  Plaintiffs argue that the foregoing actions amounted to coercion, intimidation, threats, or interference with plaintiffs' exercise of their rights under the Fair Housing Act, in violation of 42 U.S.C. § 3617.  Also, during oral argument on this motion and in supplemental briefing, plaintiffs argued that Miranda Self's initiation of criminal charges against Kayla Carreker for reckless endangerment, based upon the aforementioned incident

---

[168] Doc. no. 172-15 (Penner dep.), at 62-73.

[169] *See* doc. no. 172-40 (Complaint filed July 6, 2018).

[170] Plaintiffs include comments posted by Jessica Penner on a media outlet's Facebook page, criticizing plaintiffs' counsel, and expressing her opinion that the accusations against her father were "made up."  *See* doc. no. 179 (Plaintiffs' Statement of Facts and Memorandum of Law in Support of Their Opposition to Daughter Defendants' Motion for Partial Summary Judgment), at 5-11.

that occurred at the mobile home park on March 14, 2018,[171] was retaliatory.[172]

But, neither the fake Facebook account nor the State Bar complaint could possibly have infringed plaintiffs' right to use and enjoy the leased property. Moreover, the charge against Carreker which ultimately led to her conviction[173] cannot substantiate Fair Housing Act liability.  In any event, and regardless of whether any of the acts identified by plaintiffs could be considered "interference" or "retaliation" in violation of § 3617, all of the actions complained of were alleged in plaintiffs' *briefs*, and not in the amended complaint.  Each of those actions occurred well prior to February 20, 2020:  the date on which the complaint was amended.  A complaint cannot be amended yet again through an argument in a brief opposing summary judgment.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)).  Accordingly, summary judgment in favor of the daughter defendants is proper as to the claims alleged in Count II of the amended complaint.

**D.** **Document No. 153** — *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs seek summary judgment on the claim of fraudulent transfer of assets

---

[171] See the discussion in the last two paragraphs of Part I.B. of this opinion, *supra*.

[172] *See* doc. no. 237 (Hearing Transcript), at 28; doc. no. 236 (Plaintiffs' Response to Daughter [Defendants'] Argument Relating to § 3617), at 19-20.

[173] The conviction (for a lesser offense) was appealed to the Circuit Court for trial *de novo*.

alleged in Count VII of their Amended Complaint.[174]   The pertinent portions of that

count read as follows:

> 120.  On March 9, 2018, Defendant Randy Hames fraudulently
> transferred his ownership of all of his properties in Cullman County,
> including the property on which Hames Marina, LCC [*sic*] was located,
> to his daughters, Defendants Penner, Self, Sahurie, Mary Hames and
> Dolbeer in violation of the Alabama Fraudulent Transfer Act, *Alabama
> Code* § 8-9A-1, *et seq*. (2017).  This was the property that was also
> subject to the *Lis Pendens*.[175]

> 121.  To the extent Randy Hames had a contract or agreement
> with his co-defendant daughters to transfer his real property to them, it
> is void and unenforceable due to inadequate consideration, fraud and
> suppression, an existing *Lis Pendens*, and for violation of public policy.
> The transfer of assets by Defendants is in violation of the Alabama
> Fraudulent Transfer Act, *Alabama Code* § 8-9A-1, *et seq*. (2017).

Doc. no. 58 (Amended Complaint), at 21-22 (italics in original, footnote supplied).

The Alabama Uniform Fraudulent Transfer Act was enacted in 1989 for the

purpose of "protect[ing] a debtor's estate from being depleted to the prejudice of the

debtor's unsecured creditors."  *SE Property Holdings, LLC v. Braswell*, 255 F. Supp.

3d 1187, 1198 (S.D. Ala. 2017).  It "provides a remedy for a creditor who alleges that

a debtor has fraudulently transferred assets in order to avoid satisfying the debt."  *Ex

parte HealthSouth Corp.*, 974 So. 2d 288, 293 (Ala. 2007).

---

[174] *See* doc. no. 58 (Amended Complaint), at 21-22; doc. no. 153 (Plaintiffs' Motion for Partial Summary Judgment); and doc. no. 161 (Plaintiffs' Statement of Facts and Memorandum of Law in Support of Motion for Partial Summary Judgment).

[175] See the discussion in Part I.D., *supra*.

The Act refers to the transferor of property as the "debtor," and the individual defrauded by the transfer as the "creditor." Ala. Code § 8-9A-1.[176] Thus, for purposes of the Act, a tort claimant is a "creditor" and an alleged tortfeasor is a "debtor." *Richardson v. Chambless*, 266 So. 3d 684, 689 (Ala. 2018). The debtor-creditor relationship arises on the date that a creditor's cause of action *accrues*: that is, it arises on "the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties." *Cox v. Hughes*, 781 So. 2d 197, 201 (Ala. 2000) (quoting *Granberry v. Johnson*, 491 So. 2d 926, 928 (Ala. 1986)).

The Act proscribes both actual and constructive fraud. *See* Ala. Code § 8-9A-4(a) (actual fraud); *id*. § 8-9A-4(c) (constructive fraud); *id*. § 8-9A-5 (constructive fraud). As discussed in the following sections, the court finds no genuine factual dispute about Hames's violation of the Act. The record conclusively demonstrates plaintiffs' entitlement to relief on Count VII, regardless of whether assessed for actual or constructive fraud, as to the Cullman County real property Hames conveyed to his daughters[177] in an obvious attempt to shield those assets from money judgments that might result from plaintiffs' claims.

---

[176] Specifically, the Act defines "creditor" as "[a] person who has a claim," and "debtor" as "[a] person who is liable on a claim." Ala. Code §§ 8-9A-1(4), and -1(6).

[177] See the discussion in Part I.E., *supra*.

**1. Actual fraud**

Claims of actual fraud under the Act turn upon whether "the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." Ala. Code § 8-9A-4(a).  The issue of a debtor's subjective intent is inherently case-specific, and "[n]o specific combination of badges [of fraud] is necessary for a finding of actual intent." *Braswell*, 255 F. Supp. 3d at 1201-02.  Even so, the Act contains a nonexhaustive list of factors relevant to the determination of a debtor's intent:

> (b)   In determining actual intent under subsection (a), consideration may be given, among other factors, to whether:
>
> (1)  The transfer was to an insider;
>
> (2)  The debtor retained possession or control of the property transferred after the transfer;
>
> (3)  The transfer was disclosed or concealed;
>
> (4)  Before the transfer was made the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;
>
> (6)  The debtor absconded;
>
> (7)  The debtor removed or concealed assets;
>
> (8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
>
> (9)  The debtor was insolvent or became insolvent shortly

68

after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Ala. Code § 8-9A-4(b)(1)-(11).

Here, the record establishes at least six indicia of an actual intent to defraud: (1) Randy Hames conveyed all of his Cullman County real property to "insiders,"[178] his five daughters;[179] (2) he relinquished little control over the properties,[180] as demonstrated by his payment of property taxes and various property-related expenses after the transfer;[181] (3) the warranty deeds from Hames to his daughters were executed after he learned that eleven females were cooperating with governmental authorities;[182] (4) "[t]he transfer was of substantially all [of] the debtor's assets";[183] (5) "[t]he value of the consideration received by the debtor was [*not*] reasonably

---

[178] Ala. Code § 8-9A-4(b)(1).

[179] *Id.* § 8-9A-1(8)(a) (defining the term "insider" as including "[a] relative of the debtor").

[180] *Id.* § 8-9A-4(b)(2) ("The debtor retained possession or control of the property transferred after the transfer.").

[181] *See* doc. no. 155-11, at ECF 3-32 (records showing *ad valorem* property taxes paid by Hames), and doc. no. 155-26 (check payments).

[182] *See, e.g.*, Ala. Code § 8-9A-4(b)(4) ("Before the transfer was made the debtor had been sued or threatened with suit"); doc. no. 154-1, at ECF 2 (Mar. 7, 2018 text from Mary Hames to Hames: "Jessica says they have 11 names; *you gotta get the deeds done*.") (emphasis supplied)).

[183] Ala. Code § 8-9A-4(b)(5).

equivalent to the value of the asset transferred";[184] and (6) Hames expressly discussed the conveyance of all of his Cullman County real property to his daughters "as joint tenants and later making equitable division" among them as the best means to "preserve the property" and protect it from civil judgments.[185]

## 2. Constructive fraud

Unlike actual fraud, "constructive fraud is based on facts and circumstances which courts have said constitute legal fraud, regardless of actual intent." *Granberry*, 491 So. 2d at 929. For example, fraudulent intent can be "inferred by law from the great disparity between the real value [of property conveyed to a third party] and the consideration given" for the conveyance, if any. *J.C. Jacobs Banking Co. v. Campbell*, 406 So. 2d 834, 844 (Ala. 1981).[186] Additionally, a debtor's conveyance of real property "to a family member in anticipation of a creditor's potential claim" is subject to "especially careful scrutiny." *McPherson Oil Co. v. Massey*, 643 So. 2d

---

[184] Ala. Code § 8-9A-4(b)(8) (alteration supplied).

[185] *See, e.g.*, doc. no. 154-1, at ECF 4 (Mar. 7, 2018 text from Hames to daughter Mary: "Worked on deeds today. Angela suggests deeding each tract to the 5 of you as joint tenants and later making equitable division [as best means] of civil suit avoided or beaten."); *id.* (Hames to Mary Hames: "I may just do it that way and get everyone to sign off for me to later make equitable division. *Could preserve the property that way*.") (emphasis supplied); *id.* at ECF 5 (Mary Hames to Hames: "*Protecting yourself is the #1 goal right now*") (emphasis supplied)).

[186] The *Jacobs Banking* opinion overruled *Smith v. Wilder*, 120 So. 2d 871 (Ala. 1960), "to the limited extent that it [*Smith v. Wilder*] require[d] actual proof of the grantor's fraudulent intent before a conveyance may be partially set aside because made for substantially inadequate consideration." 406 So. 2d at 844 (citing *London v. G. L. Anderson Brass Works*, 72 So. 359 (Ala. 1916); *Little v. Sterne*, 27 So. 972 (Ala. 1899); *Gordon v. Tweedy*, 71 Ala. 202 (1881)).

595, 596 (Ala. 1994) (citing *Pennington v. Bigham*, 512 So. 2d 1344 (Ala. 1987)).

The record establishes that Hames conveyed real property worth at least $1.9 Million to family members, and that he did so following the accrual of plaintiffs' claims, whatever their merit, in exchange for little or no consideration. The warranty deeds from Hames to his daughters recite that each property was conveyed "in consideration of Ten and No/100ths dollars and other valuable consideration."[187] In other words, Hames exchanged extremely valuable property for a paltry sum. Moreover, and notwithstanding the warranty deeds' formulaic recitation of ten dollars consideration, Hames testified that the daughter defendants actually "didn't pay anything": he described the conveyances collectively as "a gift."[188]

The fraudulent conveyance discussed in *SE Property Holdings, LLC v. Braswell*, 255 F. Supp. 3d 1187 (S.D. Ala. 2017), is similar to the facts of this case. There, a debtor conveyed to his wife two properties, worth approximately $3 Million, in exchange for twenty dollars consideration. *Id.* at 1190. The husband's creditor filed claims against the couple based upon the Alabama Uniform Fraudulent Transfer Act. The court determined, on cross-motions for summary judgment, as follows:

> To establish reasonably equivalent value, defendants . . . . do not, and cannot reasonably contend that the $10 paid by [debtor's wife] to

---

[187] Doc. nos. 154-20 through 154-23.

[188] Doc. no. 172-5 (Hames dep., Jan. 14, 2021), at 342.

> [debtor] in each transaction comes *anywhere close* to establishing
> "reasonably equivalent value. . . . Indeed, they do not identify any
> meaningful consideration whatsoever flowing from transferee to
> transferor in exchange for the real property at issue.

*Id.* at 1199 (alterations emphasis supplied).  Thus, the court deemed the conveyance

constructively fraudulent, denied the couple's motion, and entered summary judgment

for the plaintiff-creditor.  *Id.* at 1211-12.

In like manner, this court finds that the Hames family transactions are devoid

of valuable consideration, and draws the inference of fraud on these facts alone,

without reliance on the evidence regarding Hames's actual intent, discussed *supra*,

in Part II.D.1.

Plaintiffs have established that Randy Hames's conveyance of his Cullman

County property to his daughters was fraudulent, regardless of whether the

transactions are viewed through the lens of actual or constructive fraud.  Accordingly,

summary judgment will be entered in favor of plaintiffs on the claim alleged in Count

VII of their amended complaint, but only to the limited extent of entering a

preliminary injunction against any further conveyances of the Cullman County

property, pending the outcome of trial in this case.

### 3. Cash transfers

Count VII contains no language indicating that plaintiffs asked the court to

claw back the cash transfers described *supra*, in Part I.F.  Plaintiffs *clearly asked* the court to rescind the conveyance of certain real-property on the basis of fraud[189] — a request the court will grant for the reasons discussed above.   However, even construed liberally in accordance with Rule 8(a) of the Federal Rules of Civil Procedure, the amended complaint cannot be said to contain a request for rescission of the cash transfers.  Plaintiffs cannot now, by way of a summary judgment motion and brief, implicitly amend their complaint.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (*per curiam*) (noting that the "liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage").  Stated differently, evidence of the cash transfers is not material to any cause of action pled in the amended complaint.  Thus, to the extent that plaintiffs' motion for summary judgment requests rescission of Hames's cash transfers, the motion is denied.

## III.  CONCLUSION

A separate document, containing the orders and judgments that are consistent with the rulings discussed in this memorandum opinion, will be entered contemporaneously herewith.

---

[189] *See* doc. no. 58 (Amended Complaint), ¶¶ 120-121, at 21-22.

**DONE** this 15th day of June, 2023.

_____
Senior United States District Judge